**In re EIGHTY SOUTH LAKE, INC. Debtor.**

**Bankruptcy No. LA 85–17785–LF.**

United States Bankruptcy Court, C.D. California.

July 28, 1986.

Cynthia M. Cohen, Stutman, Treister & Glatt, Los Angeles, Cal., for moving party.

Scott B. Whitenack, Woodland Hills, Cal., for debtor.

## MEMORANDUM OF DECISION AND ORDER RE SANCTIONS FOR BAD FAITH FILING

LISA HILL FENNING, Bankruptcy Judge.

This matter is before the court on a motion for sanctions against the debtor and its attorney in connection with the dismissal of the debtor's chapter 11 case on the grounds of bad faith filing. All major creditors and the United States Trustee joined in the motion for dismissal. Michael Feddersen, conservator of the estate of Dr. Richard J. Mazurek; Nicholas Labedz, as successor trustee of the Richard J. Mazurek Trust; and Bank of America were the moving creditors who conducted the discovery and preparation for the hearing on the dismissal motion (collectively the "Movants"). Movants seek sanctions in the form of reimbursement of their attorneys' fees in the cumulative amount of approximately $312,997.

After three days of evidentiary hearings, the motion to dismiss was granted upon this Court's determination that the debtor, Eighty South Lake, Inc. (hereafter "Eighty"), filed its bankruptcy petition in bad faith as part of a scheme to divest two separately appointed state court receivers of their possession and control over real property transferred to the debtor on the eve of the bankruptcy filing. The order dismissing the Chapter 11 case on February 28, 1986 was based on oral findings and conclusions so that the parties could immediately return to state and federal courts to resolve the pending litigation involving the creditors, the debtor, its principals and other parties. The request for sanctions was taken under submission.

This court now finds and concludes that the sum of $40,860 is the appropriate amount of sanctions. Eighty and its counsel, Scott Whitenack, shall be jointly and severally liable for payment. Movants are each entitled to their proportionate share based upon the declarations filed in support of the requests for sanctions. In support of this award, this opinion sets forth the evidence, findings and conclusions with respect to the motion to dismiss and the debtor's conduct of the proceedings in this Court.

## BACKGROUND

Eighty's schedules listed three groups of real property as the only assets of the estate. All were transferred to Eighty by quit-claim deeds within three weeks before this chapter 11 petition was filed on December 4, 1985:

(1) Two office buildings—"Eighty South Lake," located in Pasadena, California, and Newton Towers, located in Torrance, California ("the Mazurek Properties")—were transferred to Eighty by Dr. Richard J. Mazurek, as trustee for the Richard J. Mazurek Trust. The quit-claim deeds were recorded December 4, 1985.

(2) Three condominium developments— (Oxford Court Condominiums, Park Place Condominiums and Bingham Manor Condominiums) located in Houston, Texas ("the Texas Properties")—were transferred to Eighty by National Mortgage Equities Corporation ("NMEC"). The quit-claim deeds

were apparently not recorded until January 1986.

(3) Six apartment buildings located in California ("the California Properties") were also transferred to Eighty by NMEC (sometimes referred to collectively with the Texas Properties as the "NMEC Properties"). These quit-claim deeds were recorded November 21, 1985.

According to Eighty's president, its only business has been to obtain these properties by quit-claim deed, and to "organize its position on earth". The record established that Eighty has no operating business; no employees; no regular books or records; and no creditors other than liabilities assumed upon the transfer of the specific properties listed above.

### The Mazurek Properties

In late 1984, Troy Cory, also known as Keith Whitenack ("Cory"), became the self-described financial advisor to Dr. Richard J. Mazurek ("Mazurek"), a wealthy but manic depressive individual who had been repeatedly admitted to various mental institutions. Title to Mazurek's principal assets was in the name of the Richard J. Mazurek Trust under Declaration of Trust dated February 24, 1984 (the "Trust"), of which Mazurek was then sole trustee. In early 1985, Cory's son, Scott Whitenack ("Whitenack"), joined him in Mazurek's inner circle of advisors. On February 1, 1985, Mazurek executed a blanket power of attorney granting Whitenack the right to collect all rents and profits from Mazurek's properties and to encumber them.

On March 25, 1985, in a meeting with Cory and Whitenack, Mazurek transferred the Mazurek Properties to Signet Key Systems, Inc. ("Signet") and received 48½% of Signet's stock in exchange. Signet is a Nevada corporation whose charter had been revoked by the Nevada Secretary of State. Signet's other shareholders are Cory (48½%) and Whitenack (3%). At all material times, Cory is and has been president and chairman of the board of Signet; and Whitenack is and has been vice-president, chief operating officer, and counsel for Signet.

On March 25, 1985, Mazurek and Cory also executed Articles of Incorporation for Eighty as a Nevada corporation. Eighty remained a wholly inactive corporate shell for the next five months.

Bernard Mazurek, Mazurek's father, discovered the transfers of the properties to Signet and immediately obtained an order appointing Michael Feddersen as temporary conservator for Mazurek's estate on March 28, 1985.[1] The Superior Court simultaneously issued a temporary restraining order prohibiting Whitenack, Cory and the other defendants, from:

"3. Collecting, concealing, transferring, removing or otherwise disposing of any property of Dr. Richard J. Mazurek *or any entity in which he has an interest.* Such property includes but is not limited to all cash, notes, *real estate,* precious metals and gems, stocks, bonds, *securities,* credits to checking or other accounts at financial or other institutions or with other persons, debts and obligations in favor of or belonging to Dr. Richard J. Mazurek or any entity in which he has an interest.... Any change in the form or title or incident of ownership or control of any property of Dr. Richard J. Mazurek or any entity in which he has an interest shall be deemed a disposition for purposes of this Order; ..." (Emphasis supplied.)

On April 26, 1985, Feddersen, Mazurek's Conservator, and Nicholas Labedz as successor trustee of the Trust ("Trustee"), filed a petition in the Superior Court of Los Angeles under Section 2520 of the California Probate Code ("the 2520 Proceeding"), seeking an order voiding all of the March 25 transfers. On May 17, 1985, David L. Ray was appointed receiver ("Mazurek's

---

1. In July 1985, Mazurek consented to an order confirming Fedderson as permanent conservator.

Receiver") and took over the management and control of the Mazurek properties.

While discovery on the merits was pending in the 2520 Proceeding, Cory and Whitenack activated Eighty. The first meeting of the board was held on August 31, 1985 to adopt by-laws, elect officers and approve the proposed acquisition of the Mazurek and NMEC Properties. Cory was elected as president, Whitenack as vice-president, and Tina Kincaid as secretary-treasurer. During the hearings in this case, Whitenack protested that he declined to be vice-president and instead only served as Eighty's counsel. However, he co-signed the official certification of the entire election, including his own. That resolution has never been rescinded nor amended with the Nevada Secretary of State.

Thus, since August 31, 1985, Whitenack has served simultaneously as director, vice-president and attorney for Eighty; officer, attorney and part-owner of Signet; and, through the power of attorney, attorney in fact and fiduciary of Mazurek. Whitenack's father, Cory, has simultaneously served as president and chairman of both Eighty and Signet (of which he was also part owner) and as Mazurek's personal financial advisor.

On November 18, 1985, Cory, on behalf of Eighty, negotiated an "Agreement of Sale" with Signet to purchase the Mazurek Properties in exchange for 25,000 shares of newly issued Eighty stock. Signet thereupon transferred 3750 shares of that Eighty stock to Cory, as his "fee" for arranging the transfer.

On December 2, 1985, Cory, in his capacity as president of Signet, executed quit claim deeds transferring the Mazurek Properties to Eighty. The quit claim deeds indicate on their face that $0 documentary transfer tax was due, "computed on full value less liens and encumbrances remaining at time of sale". The deeds were recorded on December 4, 1985, the day the Chapter 11 case was filed. Immediately upon the Chapter 11 filing, Whitenack sent letters to all of the tenants of the Eighty South Lake and Newton Towers Building directing that rentals be paid to Eighty instead of Mazurek's Receiver.

The execution of the Agreement of Sale appears to have been an act prohibited by the terms of the injunction because Signet was "an entity in which [Mazurek] has an interest" by virtue of his ownership of 48% ½ of the stock. Cory and Whitenack could not have reasonably believed that the injunction permitted this type of transfer.

It is unclear, however, whether the state court injunction was still in effect when the quit-claim deeds were actually executed by Cory. The injunction may have expired on November 20, 1985, because a continuation order was not entered until November 22, 1985. The effect of the discrepancy in the dates and whether Cory and Whitenack violated the injunction can most properly be determined by the Superior Court issuing the injunction and the continuation order.

For the purpose of the present case, the issue is whether the debtor acted in bad faith in transferring the Mazurek Properties and filing this chapter 11 case. Eighty's board approval of the transfer and the execution of the Agreement of Sale occurred before November 20th. Both actions ignored the injunction. Significantly, Eighty and its counsel never asserted that the injunction had lapsed, arguing instead that its terms did not restrain Signet from transferring its properties because Mazurek only owned 48% ½ of Signet's stock. This contention wholly lacks merit. Signet could only act through Cory, Whitenack and Kincaid who were enjoined from effectuating such a transfer. They chose to make transfers prohibited by the terms of the injunction despite their apparent belief that it was still in effect. This defiance of state court orders is itself strong evidence of the debtor's bad faith in the transactions leading to the filing of this petition.

The Chapter 11 filing forced Mazurek's representatives to seek immediate relief from the turnover requirements of 11 U.S.C. § 543; relief from the automatic stay to pursue the state court litigation; and, ultimately, dismissal of the case when

the nature and scope of Eighty's bad faith became evident. The filing thus caused the Mazurek estate to incur attorney fees in the approximate amount of $224,275.

*The California and Texas Properties*

Eighty acquired its quit-claim deeds for the California and Texas Properties (collectively the "NMEC Properties") from David Feldman, president of National Mortgage Equity Corporation ("NMEC"). Feldman was an occasional business associate of Cory.

Although it is unclear who initiated this transaction, on August 7, 1985, Feldman wrote to Cory in his capacity as president of Signet offering to quit-claim the California and Texas Properties to Signet. The offering letter warned that "Bank of America is asserting various claims against these properties, and that they are, or may be the subject of various law suits or other proceedings." Cory's deposition testimony was equivocal as to whether he in fact investigated the Bank's claims, but this letter was sufficient to put him on notice. Although Feldman had offered to sell the properties to Signet, Cory apparently decided they should be quitclaimed to Eighty. The Contract of Sale executed on November 18, 1986 described the assets being sold to Eighty as "Seller's legal and/or equitable interest *if any*, in the California property and the Texas property" (emphasis supplied), and cautioned Eighty to obtain a preliminary title report.

A title report on the Texas Properties would have revealed that Bank of America (the "Bank"), not NMEC, held record title to the Texas Properties as the result of a 1984 foreclosure sale conducted by NMEC as the Bank's agent. A title report on the California Properties would have revealed Assignment of Deeds of Trust recorded February 22, 1985 assigning all of NMEC's beneficial interest in the properties to the Bank. (NMEC's affiliates may have still held bare legal title.) Because any prudent buyer of real property would have investigated record title prior to purchase, Cory's failure to obtain a preliminary title report

under these circumstances is persuasive evidence that the NMEC transaction was not in good faith but rather was intended to delay, hinder and defraud the Bank and NMEC's other creditors.

Moreover, as recited in the Contract of Sale, Feldman furnished Cory a copy of the Superior Court order appointing Sidney Landis as receiver of the California Properties on August 30, 1985 (the "NMEC Receiver") to manage them during the pendency of a suit brought by the Bank against NMEC and its affiliates. Cory could easily have obtained a copy of the Preliminary Injunction, entered the same day, that enjoined NMEC and its agents, including "all persons and entities acting in concert with them," from transferring or collecting any rents or profits from the California Properties. In addition, multi-district litigation is pending in the Central District of California in which the Bank, as trustee under mortgage pooling and service agreements on the loans solicited by NMEC and sold to investor institutions, has accused NMEC and Feldman of fraud, misrepresentation and securities fraud.

All of the California properties were in default under the Bank's trust deeds when the NMEC Receiver was appointed. Those defaults have not been cured. On October 28, 1985, the Bank noticed a trust deed sale for December 5, 1985.

On November 18, 1985, the same day that Eighty authorized the issuance of stock to Signet for the transfer of Mazurek Properties, Feldman executed quit-claim deeds transferring to Eighty all of NMEC's interest—whatever that might have been— in both the California and Texas Properties. The deeds were recorded on November 21, 1985, just two weeks prior to the filing of the Chapter 11 case.

Paralleling the Mazurek transaction, each of the NMEC deeds contains a hand written statement by Cory that the "liens and encumbrances on the property are greater than the value of the property," a statement used to excuse the payment of any documentary transfer tax. The Bank's liens on the NMEC Properties exceed $18

million. The only cash consideration allegedly paid for transfer of the NMEC Properties was $10,000, drawn on Signet's account. Signet also agreed to pay an additional $90,000, secured by Signet stock. Eighty agreed to share with NMEC any profits it might receive from a subsequent sale of the NMEC Properties. Cory also transferred to Feldman *individually* 100,000 shares of another of Cory's Nevada corporations of uncertain value. However, Feldman simultaneously executed a proxy to Cory, giving him unlimited power to vote these shares.

As further evidence of the debtor's bad faith, the transfer of funds and the obligations incurred by Signet in this transaction violated the injunction in the 2520 Proceeding because of Mazurek's 48½% ownership of Signet's stock.

The overall pattern to Cory's activities compels the conclusion that he was fully aware of the Bank's claims, the pending lawsuits, and the state of record title. In short, Signet/Eighty paid about $10,000 for the right to speculate with Feldman on the chance of a NMEC victory in its various lawsuits with the Bank. Eighty's contribution to that desired result was to open another front of the litigation war in bankruptcy court by filing the Chapter 11 case.

The attorneys' declarations establish that the Bank incurred attorneys' fees and expenses in the amount of $88,722 in connection with this bankruptcy case. The Bank has in fact been delayed and hindered in its ability to enforce its claims against the NMEC Properties by this bad faith filing. Therefore, the Bank is entitled to recover a reasonable portion of its fees and costs.

## DISCUSSION

### *The Rule 9011 Standard*

Based on the facts set forth above, this Court ordered dismissal of the case because this chapter 11 petition constituted a particularly aggravated example of a bad faith filing within the meaning of 11 U.S.C. § 1112(b). The issue here is sanctions. Whether sanctions ought to be awarded must be determined under the standards set forth in Rule 9011 of the Rules of Bankruptcy Procedure:

"The signature of an attorney or party constitutes a certificate by him that he has read the document and that to the best of his knowledge, information, and belief, formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or good faith argument for the extension, modification, or reversal of the existing laws; and that it is not interposed for any improper purpose, such as to harrass, to cause delay, or to increase cost of litigation ... If a document is signed in violation of this rule, the court on motion or on its own initiative, *shall impose on the* person who signed it, the represented party or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee." (Emphasis supplied.)

Paralleling the 1983 amendments to F.R. C.P. Rule 11, Rule 9011 is now mandatory in form, intended to encourage rather than merely permit the use of appropriate sanctions. *Cinema Service Corp. v. Edbee Corp. (In Re Edbee),* 774 F.2d 584, 586 (3rd Cir.1985).

Prior to the 1983 amendments, courts interpreted the language of Rule 11 to require a finding of subjective bad faith and wilful violation of the rule before imposition of sanctions against a signing attorney was proper. *Badillo v. Central Steel and Wire Co.,* 717 F.2d 1160, 1166 (7th Cir. 1983); *Nemeroff v. Abelson,* 620 F.2d 339, 350 (2d Cir.1980).

In *Zaldivar v. City of Los Angeles,* 780 F.2d 823 (9th Cir.1986), the Ninth Circuit held that the 1983 amendments require a new legal standard to determine whether the imposition of sanctions is appropriate under Rule 11:

"The new text represents an intentional abandonment of the subjective focus of the Rule in favor of an objective one. The certificate now tests the knowledge

of the signing attorney by a reasonableness standard. The former requirement of willfulness has been deleted. The [new] standard is one of reasonableness under the circumstances. This standard is more stringent than the original good-faith formula and thus it is expected that a greater range of circumstances will trigger its violation. Fed.R.Civ.P. 11 advisory committee note." 780 F.2d at 829.

The Ninth Circuit found support for its interpretation of the 1983 amendments in *Eastway Construction Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985). The *Eastway* court stated:

"For the language of the new Rule 11 explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed. Simply put, subjective good faith no longer provides the safe harbor it once did." *Id.* at 253.

Under Rule 9011, the threshold inquiry is whether, "after reasonable inquiry," this chapter 11 filing is "well grounded in fact and is warranted by existing law", or whether it was "interposed for any improper purpose". Based on the foregoing facts, this court concludes that Eighty's chapter 11 petition was *not* well grounded in fact or law. An attorney making reasonable inquiry into the viability of this petition could not have concluded that it was a meritorious filing. The filing was specifically intended to hinder the state court receivers in the exercise of their duties, to cause delay in the enforcement of Movants' rights, to obtain and divert the rents and proceeds of these properties, and to divest the state courts of jurisdiction over these issues. The debtor provided no factual or legal justification for bringing this case into bankruptcy court.

### The Basis for the Dismissal

█ This case falls squarely within the legally well-defined category of bad faith filings known as "new debtor syndrome". *In California Mortgage Service v. Yukon Enterprises, Inc. (In re Yukon Enterprises, Inc.)*, 39 B.R. 919, 921 (Bankr.C.D.Cal. 1984), Judge Russell described this common factual pattern as follows:

"1. The transfer of distressed real property into a newly created or dormant entity, usually a partnership or corporation;

2. The transfer occurring within close proximity to the filing of the bankruptcy case;

3. No consideration being paid for the transferred property other than stock in the debtor;

4. The debtor having no assets other than the recently transferred distressed property;

5. The debtor having no or minimal unsecured debts;

6. The debtor having no employees or ongoing business; and

7. The debtor having no means other than the transferred property to service the debt on the property."

The *Yukon* case held that:

"[O]nce the creditor establishes the transfer of the distressed property to the debtor was in close proximity to the filing of the case, a *prima facie* showing of bad faith has been shown, thus creating a rebuttable presumption of bad faith." *Id.* at 921.

*See, also, Duggan v. Highland-First Avenue Corp.*, 25 B.R. 955 (Bankr.C.D.Cal. 1982).

The Eighty case has all of the *Yukon* earmarks of the "new debtor syndrome", with minor variations that appear to have been manufactured by the debtor with knowledge of the "new debtor syndrome" criteria. Eighty was a dormant corporate shell until November 18, 1985, when the two agreements were executed, NMEC Properties were transferred and the issuance of stock for the Mazurek Properties was authorized. The quit-claim deeds for the Mazurek Properties were signed on December 2, 1985 and recorded on December 4, 1985, the very day the chapter 11 petition was filed. This case was filed to stop

the foreclosure sales scheduled on the California Properties the next day.

The consideration for the transfer of the Mazurek Properties was stock in the debtor. The consideration for the transfer of the NMEC Properties was allegedly $10,000 in cash from Signet, a note from Signet, an interest in future profits, if any, realized from the properties, and stock in another of Cory's corporations. While not quite the usual pattern, the form of the NMEC consideration does not by itself take this case out of the "new debtor syndrome" for two reasons: first, both the cash and other stock were contributed by Signet or Cory and did not constitute assets of the Eighty corporate shell, and second, the cash value was nominal and the non-cash value was speculative.

Eighty's only assets are the Mazurek and NMEC Properties; its only obligations are the liabilities assumed with their acquisition. The NMEC Properties were financially distressed in a conventional sense: the Texas Properties had already been sold at a foreclosure sale for the Bank's credit bid. The California Properties were facing foreclosure on December 5, the day after the petition was filed. The Mazurek Properties were distressed in two senses: first, financially, for the mortgages were in default for several months during 1985 as a result of the disputes over ownership and control; and second, administratively and legally, for the properties were in receivership; title to the properties was disputed; and an ongoing battle raged in state court regarding alleged mismanagement of the property based on claims and counterclaims between Eighty and Mazurek's Conservator, Trustee and Receiver. Absent these battles over control, the Mazurek Properties should have generated ample revenues to pay their obligations and return significant value in current profits and long term equity for their rightful owners. Under the circumstances, however, they were "distressed."

Eighty fits the classic mold with respect to the remaining "new debtor syndrome" criteria. The unsecured debt is minimal (except for the Mazurek Receiver's claim) and was assumed upon the transfer of the Mazurek Properties. Eighty has never been an operating company. Eighty had no employees, no receipts or disbursements journals, and no bank account other than the debtor-in possession account opened after filing its bankruptcy petition. Eighty, a Nevada corporation, qualified to do business in California only after filing a chapter 11 petition. Eighty's only income to service the debt on the Mazurek and NMEC Properties would be their own rental revenues.

Under the *Yukon* standard, once a *prima facie* case of "new debtor syndrome" is established, as it has been on this record, the burden shifts to the debtor to demonstrate a good faith business reason for the transfer and chapter filing. Eighty failed to meet its burden. It offered no credible evidence of good faith business purpose.

Eighty had absolutely no equity in any of the Mazurek or NMEC Properties. To the extent the filing was prompted by a desire to stop the December 5 foreclosure sales of the California Properties, the purpose was improper. *See, e.g., In re Fast Food Properties, Ltd., No. 1,* 5 B.R. 539 (Bankr.C.D. Cal.1980) (dismissing case filed solely to frustrate foreclosure sale).

Eighty argued that the filing of the chapter 11 proceeding made it more likely that Eighty would be able to receive the revenues from the rentals and obtain profits from the sale of the NMEC Properties than had it not filed. Yet Eighty presented no evidence that it had any right to receive rents or profits from either the Mazurek or NMEC Properties. The Mazurek and NMEC receivers were appointed based on the state courts' preliminary determinations that whatever right or interest Cory, Whitenack or Signet claimed in the properties was probably void due to fraud. They could transfer no greater rights in the property to Eighty than they held themselves. NMEC was not even title holder of record when it quitclaimed the Texas Properties to Eighty. By contrast, in other "new debtor syndrome" cases such as *In*

*re Thirtieth Place, Inc.,* 30 B.R. 503 (BAP 9th Cir.1983), transferring entity at least held undisputed title to the property.

The "new debtor syndrome" cases cited by Eighty in opposition to the dismissal are readily distinguishable on their facts. In *Myers v. The Beach Club (In re Beach Club),* 22 B.R. 597 (Bankr.N.D.Cal.1982), the court refused to dismiss a Chapter 11 on grounds of bad faith filing although property had been transferred to a newly-formed partnership at the eleventh hour. Unlike the present case, the transferor/general partner's liability remained unaffected by the transfer of the real property to debtor, because the debtor/transferee in *Beach Club* was a limited partnership. Moreover, the debtor had considerable equity in the property transferred, making a reorganization feasible. Under these circumstances, the transferor had a legitimate business purpose in creating the new debtor to protect the numerous other healthy assets of the general partner.

Eighty also relies upon *In re Levinsky,* 23 B.R. 210 (Bankr.E.D.N.Y.1982), and *In re Spenard Ventures, Inc.,* 18 B.R. 164 (Bankr.D. Alaska 1982), where motions to dismiss for bad faith filing were denied on grounds similar to *Beach Club.* In *Levinsky,* the debtor was a partnership and the liability of its principals was unchanged by the transfer and the filing. The *Spenard* court found that the debtor had a legitimate business purpose in filing, namely, the rehabilitation of an ongoing business. While these cases stand for the proposition that the presumption of bad faith can be successfully rebutted, they are wholly inapposite here.

Eighty further attempted to justify the transfer and Chapter 11 filing on the ground that Mazurek's Receiver and Conservator mismanaged the Mazurek Properties and caused defaults on the mortgages. Assuming *arguendo* that such mismanagement could be proven, it could not legitimate a transfer of the Mazurek Properties that served to divest the state court of jurisdiction over the mismanagement allegations, already the subject of motions pending before that court.

Eighty's rights, if any, to the Mazurek and NMEC Properties must be determined under state law. Eighty was essentially buying an interest in both the Mazurek and NMEC litigation, for its "title" was wholly derivative of Signet and NMEC's disputed claims being litigated in the California state courts and federal district court. Signet and NMEC's transfers of bare quitclaim title—admittedly devoid of any equity in the property—and Eighty's immediate Chapter 11 filing amounted to an attempt to obtain property by short-circuiting the entire judicial system to bypass the state court injunctions and receivers. These manuevers were designed to delay, hinder and defraud Movants.

The bad faith in this case is thus not merely the "new debtor syndrome". Eighty's filing was intended to circumvent other court orders or proceedings, constituting an independent ground for finding bad faith. *See, e.g., Setzer v. Hot Productions, Inc. (In re Setzer),* 47 B.R. 340, 345–46, 348 (Bankr.E.D.N.Y.1985) (bad faith where debtor filed to circumvent district court order denying leave to file amended answer and counterclaim); *In re Winn,* 43 B.R. 25, 27–28 (Bankr.M.D.Fla. 1984); (bad faith where primary purpose in filing was to frustrate district court contempt order for violation of TRO); *In re Port Richey Service Co.,* 44 B.R. 634, 635 (Bankr.M.D.Fla.1984) (bad faith where debtor filed solely to delay enforcement of state court order requiring debtor to move waste water treatment plant); *In re Jesus Loves You, Inc.,* 46 B.R. 37, 41 (Bankr.M. D.Fla.1984) (bad faith where debtor filed primarily to frustrate state court action involving state policy governing charitable corporations); *In re Ofty Corporation,* 44 B.R. 479, 482 (Bankr.Del.1984) (bad faith where debtor's sole purpose in filing was to circumvent district court liquidation order in federal receivership proceeding).

### The Calculation of the Amount of Sanctions

As a direct result of the filing of this chapter 11 case, Movants incurred tremen-

dous litigation costs and attorney fees to protect their interests in the Mazurek and NMEC Properties by dispelling the illusion that Eighty was a bona fide debtor entitled to the protection of the bankruptcy court. Emergency and expedited pleadings were required in response to the filing; numerous court hearings and extensive discovery were conducted over a three-month period.

Movants request $312,997 in attorneys' fees based on uncontroverted declarations detailing the legal services rendered. The bankruptcy cases awarding fees under Rule 9011 have involved much more modest requests based on much less complicated facts. They provide little practical guidance on the question of what fees are "reasonable" under this rule. For example, in *Cinema Service Corp. v. Edbee Corp. (In re Edbee Corp.), supra,* 774 F.2d 584 (3d Cir.1985), $3,000 in sanctions was awarded to a secured creditor based on the bankruptcy court's conclusion that the debtor filed its bankruptcy petition "for purposes of delay and not for purposes of reorganization," to stop a sheriff's sale to execute on a state court judgment. The award was granted against the debtor and its counsel jointly. *See, also, In re 2218 Bluebird Limited Partnership,* 41 B.R. 540 (Bankr. S.D.Cal.1984) (awarding sanctions of $2,849 in attorneys fees for a bad faith filing); *In re Trust Deed Center,* 36 B.R. 846 (Bankr. C.D.Cal.1984) (imposing sanctions of $1,440 in attorneys fees against counsel).

■ Rule 11 cases provide some guidance on the issue of "reasonableness". In *Eastway Construction, supra,* for example, sanctions totalling $58,550 were requested but denied. The Second Circuit reversed and remanded, requiring the district court to determine and award appropriate sanctions for plaintiff's frivolous filing of a complaint alleging civil rights and antitrust violations. In performing the required analysis, the district court followed a sensible approach, although the drastically different facts there resulted in a modest fee award while yielding a significant one here. First, the *Eastway* court determined the "lodestar" figure—the calculation of the number of hours reasonably expended by opposing counsel in responding to the frivolous pleading, multiplied by a reasonable hourly rate. Using this figure as a basis, Chief Judge Weinstein then considered the policy reasons for an award of attorneys' fees under Rule 11. Sanctions are primarily imposed to deter the attorney (and when appropriate, the client) from future violations of Rule 11. This deterrent effect depends in part upon the sanctioned party's ability to pay. The greater the means an attorney has to pay sanctions, the greater the award must be to deter such future behavior and *vice versa.* The opposing side's need to be compensated for answering a frivolous pleading should also be factored into the determination of the award.

■ Using the "lodestar" approach and applying the policy reasons of deterrence and need for compensation, the following calculation of the amount of sanctions in this case is appropriate.

The chapter 11 case was but one part of a multi-faceted, multi-jurisdictional scheme to obtain revenues from properties in which the debtor had no equity interest. Thus, it is difficult to determine exactly how much time was actually and reasonably expended in responding to the bankruptcy petition of debtor, as opposed to other issues in the pending state and federal lawsuits. Discovery was conducted on a particularly wide-open front. While all technically relevant and permissible in scope, only a portion of that discovery was necessary to resolve the bankruptcy case. Further, while the presence of so many attorneys representing movants at some of the hearings and depositions in this matter may have been convenient or useful in light of the other proceedings, this Court is not persuaded that the debtor can reasonably be charged with the full amount of the fees thus generated. Sanctions are definitely warranted here, but only as to that portion of the amount requested was reasonably necessary to the result.

Movants' declarations supporting the requests for sanctions do not quantify the

proportion of the fees and costs devoted exclusively to bankruptcy issues. To estimate the absolute minimum number of hours expended on the purely bankruptcy issues, the amount of courtroom time provides a quantifiably definite and logical starting point. This matter absorbed approximately 20 hours of bankruptcy courtroom time, including 11 hearings on various motions spread out over a three-month period. Many lawyers attended those hearings on behalf of Movants. Assuming that (1) only one partner and one associate represented each of the Movants at those hearings and (2) each of those four lawyers devoted two hours for preparation for each hour in the courtroom, Movants would have incurred approximately $40,860 in legal fees based upon the reasonable hourly rates of the principal attorneys involved.[2]

The actual discovery conducted and the numerous well-researched briefs and pleadings, of course, involved far more than 60 hours of effort. Undoubtedly, more than two or three times the bare minimum calculated above was necessary to prepare and litigate this case properly. However, the right to compensation must be balanced with the ability of the sanctioned attorney (and, here, his client) to pay. Debtor's attorney is a sole practitioner. An award of Movants' total fees for the time spent exclusively on bankruptcy issues (probably in excess of $150,000) would be punitive and beyond the remedial scope of Rule 9011.

Under the circumstances here, this court concludes that $40,860 is the reasonable amount of sanctions under Rule 9011. The debtor and its counsel Whitenack shall be jointly liable for this obligation. This court recognizes that the amount of this award for a bad faith bankruptcy filing is unusually large. However, the debtor and its attorney in this case engaged in a complicated and willful scheme to defraud several sets of legitimate creditors by abusing the

bankruptcy court process. The traditional subjective bad faith test has been met here, as well as the post–1983 "reasonable attorney" standard. This filing was both legally and factually unsupportable. Unlike *Eastway*, no mitigating factors exist to justify reducing the amount of sanctions.

Indeed, the debtor and its counsel's flagrant disregard for state and bankruptcy court orders and process constitute an aggravating circumstance. Eighty, its president and its attorney (a) failed to comply with discovery in a complete and timely manner, compelling Movants to seek court enforcement of discovery orders; (b) disrupted depositions with unseemly and unprofessional remarks and other misconduct, causing the Mazurek Conservator and Receiver to seek and obtain a protective order excluding Cory from further depositions; (c) failed to appear or arrived hours late for court hearings, despite repeated admonitions from the Court; (d) misrepresented to the Court that counsel had a conflicting 15–minute appearance in another courtroom, when in fact the conflict was another full trial, forcing postponement of the evidentiary hearings here; (e) consistently filed papers late, if at all; and (f) otherwise intentionally delayed and interfered with the prompt and efficient resolution of the bankruptcy case.

■ Responsibility for the bad faith filing and, hence, for the sanctions must be jointly borne by the debtor Eighty South Lake, Inc. and its counsel Scott Whitenack. As attorney for and officer of the debtor, Whitenack signed the Chapter 11 petition and the schedules and statement of affairs that initiated this case. Unlike most bankruptcy counsel, Whitenack was a principal and participant in and had actual knowledge of the full factual background and history related above. He cannot hide behind a claim that his client failed to disclose relevant facts to him, for he is an officer of

---

**2.** The $40,860 figure was obtained by multiplying the hourly rate of each of the four principal attorneys by the estimated minimum 60 hours of time spent solely on bankruptcy issues:

| | | | |
|---|---|---|---|
| Cynthia Cohen: | 60 × $250 | = | $15,000 |
| Audrey J. Wolgemuth: | 60 × $115 | = | $ 6,900 |
| Richard T. Peters: | 60 × $215 | = | $12,900 |
| Perry L. Landsberg: | 60 × $101 | = | $ 6,060 |
| | Total | | $40,860 |

Eighty, as well as a participant in most or all of the meetings and transactions described above. Nor can the debtor, acting through Cory, distance itself from the bad faith here. Cory also had full knowledge of these facts: he is no innocent by-stander. Moreover, he is well-acquainted with the bankruptcy process, having previously filed an individual bankruptcy in 1974.[3] His declaration and deposition testimony show that he plotted the strategy of the transfers and filings and was fully involved in its implementation. He also holds himself out to be an attorney, although not admitted to any court of record. Moreover, it was primarily Cory's misconduct and his voluntary absences from the jurisdiction that disrupted the discovery process.

Because Feddersen and Labedz appropriately took the lead in the discovery and preparation for these hearings, the award will be allocated in proportion to the total fees incurred. This Court thus awards the amount of $21,900 to Michael Feddersen and Nicholas Labedz and the amount of $18,960 to Bank of America as sanctions under Rule 9011, payable forthwith.

This opinion shall constitute findings of fact and conclusions of law, as provided in Rule 9062. An appropriate order shall be entered forthwith.

**3.** In Cory's individual bankruptcy case, Judge Russell entered an order on January 31, 1975 determining a debt of $14,359.57 to be nondischargeable because it constituted money obtained by material misrepresentations and fraud. In 1982 Cory had also been convicted of grand theft from the Bank of America, evidence admitted under F.R.Evid.Rules 404 and 609 for purposes of establishing Cory's character or reputation for untruthfulness, since Eighty's evidence in opposition to the motion to dismiss consists of Cory's declaration and deposition regarding his subjective good faith in the transactions at issue here.