**In re MEYERS WAY DEVELOPMENT LIMITED PARTNERSHIP.**

**Bankruptcy No. 90–01133.**

United States Bankruptcy Court,
W.D. Washington,
at Seattle.

June 11, 1990.

Keith Allred, Davis Wright Tremaine, Seattle, Wash., for University Sav. Bank.

Jack J. Cullen, Hatch & Leslie, Seattle, Wash., for Meyers Way Development Ltd. Partnership.

## OPINION ON MOTION TO DISMISS

SAMUEL J. STEINER, Chief Judge.

The University Federal Savings Bank has moved to dismiss this Chapter 11 case on the ground that it is a bad faith filing.

## FACTS

In 1984, the Appels, Jardines and Rupeiks formed a joint venture and purchased as cotenants property in Seattle known as "Central Heights". The acquisition was out of a Chapter 11 case and from John Walton. The purchase price was $2.1 million, of which $300,000 was initially carried by Walton, and $1.8 million was financed by the bank. The original bank loan was for $2.65 million, which included reserves for interest and development costs. In June 1985, the bank refinanced the loan, increasing the principal to $4.075 million, which included reserves of $500,000 for interest and $800,000 for construction costs.

The note required monthly payments and was due in June, 1987. In 1986, the cotenants defaulted on the Walton note and put the property on the market for $8.4 million. In May, 1987, the bank again refinanced the loan for an additional $2.18 million, bringing the total of the loan to $6.255 million. The proceeds were allocated to the payment of the 1985 loan, $340,000 to pay off Walton, and the remainder to interest and development reserves. In June of 1987, the bank again refinanced the loan but indicated there would be no further extensions.

In September, 1988, the bank refinanced the loan again as a result of the original borrowers having brought individuals by the names of Sato, Loehrer and Foreman into the venture as additional cotenants. Both Sato and Loehrer had substantial development expertise and financial strength. This final extension brought the loan to $8.65 million in principal of which $6.34 million was used to satisfy the prior loan, $650,000 was set aside for interest reserves, and $1.48 million was allocated for development and construction reserves. Sato and Loehrer signed the last note delivered to the bank. However, the two withdrew their participation in December of 1988, shortly after the loan closed. The loan is secured by a deed of trust against the Central Heights property.

Over the years, the venturers have not been able to comply with their project schedule, have been unable to do anything with the property other than the commercial removal of some sand, have made no payments on the bank loan, and have been unsuccessful in their efforts to market the property. The interest reserves were exhausted by October 1, 1989. In July of 1989, the bank gave notice of default and commenced a nonjudicial deed of trust foreclosure. The principal balance due on the loan is $7,501,912.35. Interest accrues at approximately $73,000 per month. The foreclosure sale was originally scheduled for December 1, 1989, and was continued four times. The final date was February 16, 1990, the same date this Chapter 11 was filed.

Prior to the last refinance, progress toward accomplishing anything with the property was seriously impeded by disagreements between the venturers which culminated in a lawsuit commenced by the Rupeiks against the Jardines and the Appels.

The bank asserts in part that the debtor's and/or cotenants' inability to meet the development schedules constitutes another default. In response, the debtor contends that the bank is partially responsible for the difficulties in that it has refused to release funds from the construction reserves. The debtor also claims that it has a large equity in the property (based on a recent appraisal in excess of $13 million) which adequately protects the bank; and that the bank has refused to negotiate in good faith, particularly after its demand had been met that control of the property be placed in an entity which would not be subject to the demands or interests of the battling cotenants, namely the debtor.

In about September of 1989, the venturers brought Michael Neeser, a Reno developer, into the scenario. After consideration of various alternatives, Neeser recommended that a Chapter 11 be filed. Thereafter, the following occurred:

First, the Meyers–Contek Limited Partnership was formed to create the debtor's general partner. The agreement was prepared and signed by the Rupeiks and Neeser on November 10, 1989. The Certificate of Limited Partnership was filed with the

Secretary of State on January 18, 1990. The general partner of Meyers–Contek is Contek, Inc., a closely held corporation belonging to Neeser. Val Rupeiks is the only limited partner.

Second, the debtor was created. A limited partnership agreement was also prepared in November of 1989. The Certificate of Limited Partnership was filed with the Secretary of State on January 23, 1990. The debtor is composed of the Meyers–Contek Limited Partnership as general partner and the Appels, Jardines and Foremans as limited partners.

Third, the Rupeiks, the Appels and the Foremans conveyed their interests in Central Heights to the debtor on January 18, 1990. The deeds were recorded on January 25, 1990.

Fourth, this case was filed on February 16, 1990.

Prior to the formation of the debtor and the conveyances to it, the respective interest in Central Heights were: Rupeiks, 33.333%; Appels, 15%; Foremans, 25.833%; and the Jardines 25.8335%. Of the original cotenants, all but the Jardines have contributed their interests to the debtor. Neeser claims that he and/or Contek have contributed $180,000 to the expenses of the debtor, including approximately $42,000 in excise taxes required on the recording of the deeds to the debtor.

In return for their contributions (transfer of cotenant interests), the debtor's partnership shares are allocated as follows: 85% to the general partner, Meyers–Contek; 3.375% to the Appels; and 5.8125% to Foreman. The debtor was apparently created on the assumption that Jardine would participate, since the remaining 5.8125% is allocated to him.

The Meyers–Contek agreement provides that the first $100,000 of profits that might be realized from the sale or development of Central Heights is to be allocated to the Rupeiks. Of the next $1.65 million in profits, 87.88% is to go to Contek, Inc., and 12.12% to the Rupeiks. Thereafter, 70% is to be allocated to Contek and 30% to the Rupeiks.

## DISCUSSION

A. *Basis of Good Faith Filing Requirement.* While Chapter 11 contains no specific requirement that a petition be filed in "good faith", courts have consistently imposed such a requirement by way of implication. The requirement has been deemed to be "inherent in the statute and clearly inferred in 11 U.S.C. § 1112(b)", *In re HBA East, Inc.,* 87 B.R. 248 (Bkrtcy.E. D.N.Y.1988), which permits conversion or dismissal "for cause". The good faith requirement has its roots in cases decided under Chapters X, XI and XII of the Bankruptcy Act. In *In re Victory Construction Co., Inc.,* 9 B.R. 549 (Bkrtcy.C.D.Cal. 1981), the Court reviewed a host of cases decided under the Act and concluded that the good faith requirement survived the 1978 Code Amendments.

■ In general, a case has been filed in bad faith if it does not satisfy the reorganization purposes for which Chapter 11 was designed, i.e., "to protect the creditors and junior lienholders of the debtor from premature foreclosure as well as to prevent economically wasteful liquidation of valuable entities. Where a petition is filed to subvert the legitimate rights of creditors in the absence of any reasonable expectations that the debtor can successfully reorganize, there is no basis for access to Chapter 11 and the protective machinery of the automatic stay." *In re Thirtieth Place, Inc.,* 30 B.R. 503 (9th Cir.B.A.P.1983).

B. *The New Debtor Syndrome.* The bank's motion is based on the "new debtor syndrome," which has long been identified as a pattern of conduct evidencing bad faith. The "new debtor" is characterized by "a one-asset entity that has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, ..." *Matter of Little Creek Development Co.,* 779 F.2d 1068 (5th Cir. 1986). The *Little Creek* Court further stated:

Resort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees

to protect, and there is no hope of rehabilitation, except according to the debtor's 'terminal euphoria'.

The courts have established a consistent set of factors to apply in determining whether bad faith exists under the new debtor syndrome, and there is little difference among the circuits in the actual criteria applied or in the weight given to any given factor. Thus it is generally agreed that no single element is determinative, and that "a determination as to 'good faith' requires an examination of all the facts and circumstances in the case," *In re Del Rio Development, Inc.*, 35 B.R. 127 (9th Cir.B. A.P.1983). On the other hand, the Bankruptcy Courts in the Central District of California have developed a procedure to assist in a meaningful examination of the factors. *In re Yukon Enterprises, Inc.*, 39 B.R. 919 (Bkrtcy C.D.Cal.1984); and *In re Eighty South Lake, Inc.*, 63 B.R. 501 (Bkrtcy.C.D.Cal.1986). According to the two cases, the creditor must make a prima facie case of "new debtor syndrome," by establishing the following:

1. The transfer of distressed real property into a newly created or dormant entity, usually a partnership or corporation;
2. The transfer occuring within close proximity to the filing of the bankruptcy case;
3. No consideration having been paid for the transferred property other than stock of the debtor;
4. The debtor having no assets other than the recently transferred distressed property;
5. The debtor having no or minimal unsecured creditors;
6. The debtor having no employees or ongoing business; and
7. The debtor having no means other than the transferred property to service the debt on the property.

The cases also establish that "once a *prima facie* case of 'new debtor syndrome' is established ... the burden shifts to the debtor to demonstrate a good faith business reason for the transfer and chapter filing." *In re Eighty South Lake, supra.*

At this stage, the reasons for the transfer and the debtor's ability to reorganize are placed at issue.

C. *Elements of "New Debtor Syndrome", in this case.*

■ 1. *Transfer of distressed real property into a newly created entity in close proximity to bankruptcy.* The Meyers–Contek and Meyers Way Development Certificates of Limited Partnership were filed on January 18 and January 23, 1990, respectively. The fourth continued foreclosure sale was set for January 25, 1990. The quitclaim deeds from all but one of the cotenants to the debtor were recorded on January 25, 1990, and the bankruptcy petition was signed on the same day. The fifth continued foreclosure sale was scheduled for February 16, 1990, and the bankruptcy was filed that day. The evidence shows that the individuals involved in this venture were contemplating the possibility of a Chapter 11 at the time they were negotiating the formation of the limited partnership and the transfer of the property to that entity. The first element of the new debtor syndrome has been satisfied.

2. *No consideration paid for the transferred property other than the equity in the debtor entity.* A focus in "new debtor syndrome" cases is the level of the debtor's and/or debtor's principals' investment in the property. If the investment in the property is relatively small, the courts have been quick to find bad faith. *In re Corporation Deja Vu*, 34 B.R. 845 (Bkrtcy. D.Md., 1983).

In this case, three of the four cotenants quitclaimed their interests in the property to the debtor in exchange for partnership shares, to which they assigned a value of zero. The Excise Tax Affidavits also indicate that no consideration was given for the transfers, over and above the assumption of debt. Neeser and Contek, Inc., had no prior interest in the property. The debtor maintains that Neeser/Contek has expended $180,000, including $42,000 in excise tax on the transfers of the interests to the debtor. Other specific expenditures have not been identified, but it can be as-

sumed that some of Neeser's expenses were typical of those which any prospective investor would incur in evaluating the transaction for his own purposes, and some of the expenses would serve to advance the purposes of the debtor as well. Out of any sale of the property, Neeser's expenses will be repaid before profits are divided. According to the allocations outlined in the limited partnership agreements, as interpreted by the bank, Neeser will receive 57–68% of any profits of the debtor, if the venture goes forward. This translates to a $3.4 million return on Neeser's investment, assuming a $13 million sale as the debtor contends is justified by its appraisal.

In short, it is clear that the original cotenants, the debtor and Neeser have a minimal investment in the property.

3. *Debtor has no assets other than the recently transferred, distressed property.* There is no question that the Central Heights property was the only asset of the venture of the cotenants, and that it is the debtor's only asset.

4. *The debtor has minimal unsecured debts.* The issue in this regard is not whether the debtor has any unsecured debt, but whether the debtor has a "meaningful body of creditors other than those who hold a mortgage on the single asset." *Matter of South County Realty, Inc. II,* 69 B.R. 611 at 615 (Bkrtcy.M.D.Fla.1987).

The debtor's schedules show no priority debt and five unsecured creditors whose claims total $707,000. The following is a listing of the unsecured debts, together with the basis for each.

| | | |
|---|---|---|
| Clark Coleman Rupeiks | $15,000} | |
| | 100,000} | Insider; incurred prior to creation of debtor; assumed by debtor; due on refinancing, sale, or other infusion of capital. |
| Contek | 200,000 | Insider. |
| Fruhling, Inc. | 22,000 | Prepetition services. |
| Sven Goldmanis | 320,000 | Commission of real estate agent. Debtor says this was earned for locating Mr. Neeser. Assumed by debtor; due on refinancing, sale, or other infusion of capital. |
| Robert Gould | 320,000 | Rupeiks' attorney in malpractice action against Jardine & Appel. Assumed by debtor; due on refinancing, sale, or other infusion of capital. |

In essence it appears that the claims of these debtors are based on either the independent liability of the cotenants, debts to insiders, and/or future anticipated expenses. In short, it appears that the only legitimate unsecured debt is the $22,000 owed to Fruhling for prepetition excavation, and that remainder may well have been manufactured in order to defeat the bank's anticipated allegations of bad faith.

The debtor's response is that the assumptions were part of the consideration for transfer of the cotenants' property interests to the partnership. The assumptions were accomplished by notes signed by Neeser for the debtor and dated on various dates in January of 1990. Payment of all three notes is contingent on the debtor's success, and the cotenants remain liable on the obligations.

█ The notes are obviously to insiders, since they constitute payment to or on behalf of the limited partners. The debtor maintains that under the strict definition of "insider" as set forth in Section 101(30) of the Code, the only insider is Contek. However, the Court concludes that the cotenants cannot avoid being classified as insiders merely by transferring their interests

to the debtor and assuming the status of limited partners.

In view of the foregoing, the Court concludes that this debtor does not have a "meaningful body of creditors." The Court further concludes that the unsecured creditor constituency in this case has all of the earmarks of the "new debtor syndrome", with minor variations that appear to have been manufactured with knowledge of the "new debtor syndrome" criteria.

5. *The debtor has no employees or ongoing business.* The debtor maintains that it has an ongoing business in the excavation and sale of sand from the property. However, the debtor acknowledges that the primary benefit of the sand removal is the grading of the property. Neeser stated in his March 22 deposition that "our general planning at this point has been to figure the sand as kind of a zero zero. We do know in the early stages, as I mentioned earlier, that the sand will probably go negative in cash flow about 200 to 250 thousand before it turns around and starts to go back towards the black. I don't see any positive income from the sand over a long period of time." Neeser Deposition, p. 123. Historically, the sand extraction has not been pursued because of the cotenants' unwillingness to invest personal funds to offset the losses. Fruhling is now apparently performing the work under an agreement which requires it to share the short-term negative cash flow.

Inasmuch as the debtor has no employees, and excavation is not the business which is sought to be reorganized, the Court concludes that the bank has satisfied this part of its burden of proving the "new entity syndrome".

6. *The debtor has no means to service the debt other than sale of the property.* The debtor has no assets aside from the property, and the property is not income-producing. Further, neither the debtor nor its predecessors in interest have made any payments on this loan in the past. The Court concludes that this element of the "new debtor syndrome" has been met.

■ D. *Debtor's Rebuttal.* Inasmuch as the foregoing criteria of the "new debt-

or syndrome" have been established, the burden is on the debtor to demonstrate a good faith business reason for the creation of the new entities, the transfer and the Chapter 11 filing.

This inquiry has two parts. First, the Court must determine whether the transfer to the new debtor was motivated by legitimate business reasons. The second part of the inquiry relates to the debtor's ability to reorganize, i.e., the debtor's equity in the Central Heights property.

First, the debtor maintains that the transfer of the property to the new entity was motivated by a legitimate business purpose, namely to bring the property under the control of a single individual and thus free it from the infighting of the cotenants, and to vest the property in an entity with development expertise and with the resources necessary to realize its full value.

However, the facts belie these positions in that Neeser is in essence a speculator, that his capital investment is inconsequential, that he has no commitment to future advances, and that he has admitted that he does not intend to invest further capital in the project.

Further, to the extent that Neeser's role was to bring the warring cotenants together, he has only partially succeeded in doing so. To date, Jardine has not transferred his 25.8335% interest in the property to the debtor. While there may not be any current dissension between Jardine and the debtor, his interest cannot be sold without his consent or further litigation.

■ As to the question of value, the bank contends that the issue need not be reached if the Court concludes that the transfer was made in bad faith. Such was the Court's conclusion in *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988). The issue in *Phoenix Piccadilly* was "whether the court gave proper consideration to whether the debtor had equity in the secured property and had a prospect of a successful reorganization." In answer to the question, the Court held that "the prospects of a successful reorganization do

not override, as a matter of law, the finding of bad faith in this case or compel, as a matter of fact, a contrary finding." *Id.* at 1394.

The debtor relies on *In re Del Rio Development, Inc.*, 35 B.R. 127 (9th Circ.B.A.P. 1983), for the proposition that the law requires "an examination of *all* the facts and circumstances in the case," including value. However, neither *Del Rio* nor the other cases cited by the debtor identifies the role that value should play' in the good faith analysis. In *Del Rio*, the BAP remanded a case because the trial court had found the debtor unable to effectuate a plan, notwithstanding evidence of a $3 million equity cushion and a prospective purchaser. The Court did not hold that the existence of these factors compels a finding of good faith. In *In re Thirtieth Place, Inc.*, *supra*, (Judge George dissenting), the BAP reversed the trial court's finding of good faith, notwithstanding evidence of a sizeable equity and the fact that the debtor had filed a disclosure statement and plan of reorganization at the outset of the case. Thus while the Ninth Circuit has not specifically addressed the role of value in this context, its approach has been consistent with the Eleventh Circuit's position in *In re Phoenix Piccadilly, supra.*

This court adopts the Eleventh Circuit's ruling and concludes that once bad faith has been established via the use of the "new debtor syndrome", the value of the property or the size of the debtor's equity is no longer an issue.[1]

## CONCLUSION

1. The facts establish that the Central Heights property was transferred to the debtor, a newly created entity, on the eve of the filing in this case; that the original joint venturers/cotenants as well as the debtor have a minimal investment in the property; that the property was the only asset of the joint venture and is the only asset of the debtor; that the debtor has minimal unsecured debt; that the debtor has no employees or ongoing business; and

that the debtor has no means to service the secured debt other than by sale of the property. In short, all of the elements of a bad faith filing based on the "new debtor syndrome" have been established.

2. The debtor has not satisfied the burden of demonstrating a good faith business reason for its creation, the transfer of the property, and for this filing.

3. Inasmuch as the elements of bad faith have been established, the debtor's contentions as to value and/or equity are irrelevant.

4. The joint venture/cotenants acquired the Central Heights property in 1984. To date, their capital investment in the property is minimal, and they have been unable to accomplish anything toward its sale or development. Similarly, the debtor's investment is inconsequential. After repeated defaults and extensions, the bank commenced a nonjudicial deed of trust foreclosure, whereupon the debtor was formed and this Chapter 11 case was filed. Although the facts are somewhat complex, the essence of the matter is that this is a two party dispute, and that the debtor was formed and this bankruptcy was filed to frustrate the foreclosure efforts of the bank.

5. The motion to dismiss will be granted, and an appropriate order will be entered.

6. This opinion shall serve in part as any Findings of Fact and Conclusions of Law that may be necessary.

---

1. The bank contends that the consideration recited in the Excise Tax Affidavits is conclusive evidence of value. In view of the Court's conclusions, this issue need not be addressed.