**In re FRANKLIN MORTGAGE
& INVESTMENT CO.,
INC., Debtor.**

**Bankruptcy No. 92–00015.**

United States Bankruptcy Court,
District of Columbia.

July 28, 1992.

John J. Sellinger, for debtor.

DECISION ON CREDITOR'S MOTION TO DISMISS AND DEBTOR'S MOTIONS TO VACATE FINAL JUDGMENT AND FOR SANCTIONS FOR VIOLATING THE AUTOMATIC STAY.

S. MARTIN TEEL, Jr., Bankruptcy Judge.

Under the court's consideration are the motion of secured creditors Robert DeMario and Robert A. DeMario to dismiss the chapter 11 case filed by Franklin Mortgage & Investment Co., Inc. ("Franklin") on the basis that the debtor's petition was filed in bad faith, and the debtor's motions (1) to vacate a final judgment of foreclosure entered by the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida and (2) for civil contempt and sanctions against Craig Philip Rogers, Robert DeMario and Robert A. DeMario for violation of the automatic stay.

## BACKGROUND

Franklin was formed in 1966 as a real estate investment company in the District of Columbia and for many years was actively involved in the mortgage brokerage business. Since 1988, however, Franklin had been dormant as a result of the depressed commercial real estate market. For the three years prior to October 21, 1991, Franklin had no assets, no employees, and had not conducted any business. Franklyn P. DeMarco ("DeMarco") is the president, treasurer, and sole shareholder of Franklin. On October 21, 1991, DeMarco transferred to Franklin by quit-claim deed a parcel of valuable commercial real estate located at 323–325 Worth Avenue, Palm Beach, Florida ("the Worth Avenue property").

On January 6, 1992, Franklin filed a petition with this court under chapter 11 of the United States Bankruptcy Code. Franklin's only significant asset at the time of filing was the Worth Avenue property. The property consists of approximately 9,000 square feet of leasable space in a prime shopping district in Palm Beach. The property's one tenant, a jewelry store, occupies 1,500 square feet of the property and pays approximately $500 per month rent. The presence of that tenant enables DeMarco to avoid a city fine imposed upon vacant property. Although no direct evidence of value was presented, the debtor claims that the fair market value of the property is approximately $3,750,000 and that there is substantial equity in the property.

For purposes of the motion to dismiss, it is essential to discuss certain transactions involving the Worth Avenue property predating the chapter 11 filing by several

years. Robert DeMario sold the Worth Avenue property to DeMarco on December 15, 1986 for $3,150,000. DeMarco paid $900,000 of the purchase price in cash, and Robert DeMario took back a four-year $2,250,000 non-recourse note, secured by a purchase money promissory note and mortgage. The note provided that the real property stood as security for payment of principal and interest on the note and that DeMarco had no personal liability in the event of a default. The note required that interest payments be made over the four-year term, with the entire principal balance, together with all accrued and unpaid interest due on December 15, 1990. Robert DeMario subsequently assigned 3.5% of the note and mortgage to his nephew, Robert A. DeMario.

DeMarco made interest payments on the note through July 1990, but defaulted under the note when he failed to make the August 1990 interest payment. The note matured and became due and payable in full on December 15, 1990.

On December 20, 1990, the DeMarios filed a "Complaint To Foreclose Mortgage" with the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida seeking to foreclose the mortgage on the Worth Avenue property and, if the proceeds of sale were insufficient to pay the debt, to obtain a deficiency judgment.

On June 6, 1991, the DeMarios and DeMarco executed an "Agreement" and an "Escrow Agreement" (collectively referred to as the "settlement agreement") the stated purpose of which was to avoid a foreclosure proceeding and allow DeMarco additional time to attempt to perform his obligations under the note. In accordance with the settlement agreement, the DeMarios executed a mortgage modification agreement which was delivered to an escrow agent, and DeMarco executed a deed to the Worth Avenue property which he similarly delivered to the escrow agent. Under the settlement agreement, DeMarco had until October 7, 1991, to pay certain monies to the escrow agent for distribution to the DeMarios. If the money was paid under the settlement agreement, the mortgage modification would be delivered to DeMarco for recording and the escrowed deed to the property would be destroyed. On the other hand, if the money was not paid, the deed to the property would be delivered to the DeMarios for recording and the mortgage modification would be destroyed.

Due to his inability to meet the October 7 deadline, DeMarco sought a further extension of time to raise funds to complete the purchase of the Worth Avenue property. DeMarco was, around this time, considering a number of options to raise funds, including the sale of his personal residence. By letter agreement dated October 4, 1991, the parties extended the deadline for complying with the settlement agreement to October 14, 1991. The parties agreed to a further extension on October 11, 1991, extending the due date under the settlement agreement to October 21, 1991.

On October 21, 1991, DeMarco, without advising DeMario, transferred the property by quitclaim deed from himself, as grantor, to the debtor, as grantee. Although DeMarco testified that the transfer was designed to make the property more attractive to investors (since Franklin had some built-in tax advantages), DeMarco's testimony was not credible. On October 21, 1991, DeMarco could have filed a chapter 11 case under the Bankruptcy Code to reorganize the property and incident to such a reorganization could have proposed a plan calling for transfer of the property to Franklin, with Franklin to be acquired by a new investor. A new investor might not necessarily want to acquire the property in corporate form. There was no necessity of transferring the property to Franklin on October 21, 1991, other than as a delaying tactic. The Court finds that the transfer was designed to frustrate the settlement agreement and to delay or prevent the DeMarios from foreclosing on the property. Franklin paid no consideration for the property, taking the property subject to the mortgage. The quitclaim deed had the intended effect of thwarting the settlement agreement and rendering the escrowed deed ineffective, because that deed now fell outside the property's chain of title. The

DeMarios' attorney, Craig Philip Rogers, only learned of the transfer on October 26, 1991, while conducting a search of the public records.

The DeMarios, by their counsel, subsequently sought to proceed in the Palm Beach Circuit Court, to foreclose on the Worth Avenue property. This foreclosure action was noticed for December 4, 1991. On December 3, 1991, Thomas DeCarlo, counsel for DeMarco, wrote a letter to Craig Philip Rogers, counsel for the DeMarios, purporting to state an agreement to cancel the hearing set for December 4, and stipulate to an Order directing the escrow agent to disburse the deed to the DeMarios any time after January 6, 1992, unless at that time DeMarco had in hand a contract for the sale of the property, in which event the Order would not be entered prior to February 6, 1992. Because both parties appeared at the December 4 hearing, the court assumes that Rogers did not assent to the agreement. When DeCarlo questioned the propriety of the notice given of the December 4 hearing, the case was renoticed for December 19, 1991, at which time the case came on for hearing. The court decided to grant summary judgment for the DeMarios, but Judge Garrison delayed entering the judgment until January 6, 1992, upon the representation of DeMarco's attorney that he had a buyer for the property. The case was continued to the court's January 6, 1992 motion calendar.

Franklin Mortgage & Investment Co., Inc. filed a chapter 11 petition with the bankruptcy court on January 6, 1992 at 9:03 a.m. One of the primary reasons DeMarco filed the case in the District of Columbia was that he wanted to hide the filing from the Palm Beach real estate community.

At the Circuit Court hearing on January 6, 1992, Thomas DeCarlo handed Craig Philip Rogers a suggestion of bankruptcy indicating that Franklin had filed a petition under chapter 11 with the bankruptcy court in the District of Columbia that same day. In the absence of a date-stamped copy of the petition cover sheet, Judge Garrison indicated that he would hold the foreclosure judgment pending further proof of the bankruptcy filing. Although DeCarlo provided the court a telecopy of the bankruptcy petition cover sheet later that day pursuant to the court's instructions, Judge Garrison nevertheless released the Final Judgment of Foreclosure for docketing and set a sale date for the property of March 2, 1992.

On January 10, 1992, Craig Philip Rogers sent a notice of sale to the clerk of the Palm Beach Circuit Court directing the clerk to publish the notice of judicial sale in the Palm Beach Review on January 21 and 28, 1992. Rogers was advised of the Franklin bankruptcy filing on January 6, 1992, and despite his knowledge of the filing he sent the notice of sale to the clerk of the Circuit Court for publication in the Palm Beach Review. He testified that he had appeared before the bankruptcy court in the Southern District of Florida on several occasions but did not believe that his actions violated the automatic stay.

On January 28, 1992, Thomas DeCarlo filed with the Palm Beach Circuit Court a motion to vacate the foreclosure and notice of judicial sale. The Circuit Court denied the motion by Order dated February 5, 1992. Subsequently, after talking with the DeMarios' local bankruptcy counsel in Washington, D.C., Rogers also requested the Circuit Court to stop and vacate the sale of the Worth Avenue property. The Circuit Court finally entered an order vacating the sale.

## DISCUSSION AND SPECIFIC FINDINGS

### A. *Dismissal for Bad Faith Filing*

11 U.S.C. § 1112(b) provides in pertinent part:

> Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee, and after notice and a hearing, the court may ... dismiss a case under this chapter ... for cause ...

While chapter 11 contains no specific requirement that a petition be filed in "good

faith", courts have consistently imposed such a requirement by way of implication. The requirement has been inferred from the language in section 1112(b) that permits conversion or dismissal "for cause". *In re Meyers Way Development Ltd. Partnership,* 116 B.R. 239 (Bankr.W.D.Wash. 1990); *In re HBA East, Inc.,* 87 B.R. 248 (Bankr.E.D.N.Y.1988). As stated in *In re Victory Const. Co., Inc.,* 9 B.R. 549, 558 (Bankr.C.D.Cal.1981), the doctrine of "good faith" is "a safeguard against abuse and misuse of process which has been established and accepted as part of bankruptcy philosophy (either by statute or by decision) for almost a century." I agree that the broad "for cause" language in section 1112(b) supports the view that a debtor's lack of good faith may constitute cause for dismissal of a chapter 11 petition.

■ The bankruptcy courts are inherently empowered to dismiss cases in order to protect their jurisdictional integrity. As stated in *In re Loeb Apartments, Inc.,* 89 F.2d 461, 463 (7th Cir.1937), "[i]f it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities, good faith does not exist." For further example, as stated in *In re Lotus Investments, Inc.,* 16 B.R. 592, 595 (Bankr. S.D.Fla.1981), "bankruptcy courts should preserve their jurisdictional integrity by refusing to allow entities not eligible for bankruptcy relief to obtain relief by a transformation which lacks any legitimate business purposes."

■ Whether a chapter 11 case was filed in bad faith generally cannot be determined by any direct evidence of motive. However, bad faith may be inferred from the surrounding circumstances. The court's evaluation of the debtor's motive in filing its petition is central to the determination of good faith. *In re Little Creek Development Co.,* 779 F.2d 1068 (5th Cir.1986).

With respect to determining bad faith in the filing of a petition, the Court of Appeals for the Eleventh Circuit has stated:

... there is no particular test for determining whether a debtor has filed a petition in bad faith. Instead, the courts may consider any factors which evidence an intent to abuse the judicial process and the purposes of the reorganization provisions or, in particular, factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.

*In re Phoenix–Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir.1988).

■ The courts have established varying sets of factors or "badges of bad faith" to apply in determining whether bad faith exists. There is very little difference among the circuits in the actual criteria applied or in the weight given to any particular factor. Nor is there any single factor that will necessarily lead to a finding of bad faith. The court must look to the totality of all the facts and circumstances in making this determination. *Carolin Corp. v. Miller,* 886 F.2d 693 (4th Cir.1989). Among the factors that the courts have looked to in determining whether bad faith exists are:

[1.] The debtor has one asset, such as a tract of undeveloped or developed real property.

[2.] The secured creditors' liens encumber this tract.

[3.] There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or make adequate protection payments....

[4.] Typically, there are only a few, if any, unsecured creditors whose claims are relatively small.

[5.] The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation....

[6.] Bankruptcy offers the only possibility of forestalling loss of the property.

[7.] There are sometimes allegations of wrongdoing by the debtor or its principals.

[8.] The "new debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies ... bad faith cases.

*Little Creek Development Co.*, 779 F.2d at 1073. *See also Duggan v. Highland–First Ave. Corp.*, 25 B.R. 955, 961 (Bankr. C.D.Cal.1982).

■ An important circumstance involved here is DeMarco's transfer of the real property to the debtor prior to the debtor's bankruptcy filing. The test for dismissal based on bad faith pre-petition transfers of assets to a different debtor has been formulated as "whether any of the substantive or procedural rights of any of the creditors to assets, available prior to the transfer of the property, have been eroded by the transfer and subsequent Chapter 11 filing." *In re Northwest Recreational Activities, Inc.*, 4 B.R. 36, 42 (Bankr.N.D.Ga. 1980); *Duggan v. Highland–First Ave. Corp.*, 25 B.R. at 961–62; *In re Yukon Enterprises, Inc.*, 39 B.R. 919, 921 (Bankr. C.D.Cal.1984). For the reasons that follow, I find that the petition here was filed in bad faith.

First, there is no question that this dispute involves a single asset, the Worth Avenue property. The DeMarios have a lien on the Worth Avenue property by virtue of the promissory note and mortgage with DeMarco. The only unsecured creditor in the case is an accounting firm that is owed less than $5,000, a relatively small amount compared to the DeMarios' $2,250,-000 secured claim.[1] There is no evidence that had DeMarco retained ownership and filed bankruptcy that there would be *any* other creditors of his estate besides the DeMarios. Bankruptcy proceedings are not intended to resolve two party disputes (where there is only one creditor), *In re Anderson Oaks (Phase I) Ltd. Partnership*, 77 B.R. 108, 112–13 (Bankr.W.D.Tex. 1987), and the relatively insignificant unsecured claim here thus raises concerns of

good faith. The debtor has no employees except for DeMarco and minimal cash flow (from rental income), and would not be able to propose and sustain a reorganization on its own in the absence of a "white knight." DeMarco has been unsuccessful in defending against a foreclosure in state court. It is clear that the debtor would not have filed bankruptcy but for the foreclosure proceeding resulting from the dispute with the DeMarios. The timing of the petition is also indicative of bad faith. The debtor did not file bankruptcy until the day the state court was expected to enter a final judgment of foreclosure against the property. Bankruptcy offered the only possibility of forestalling loss of the property. The filing frustrated the DeMarios' efforts to enforce their rights. In sum, this matter is basically a two-party dispute that had already been litigated in state court to the brink of entry of an order for foreclosure. When DeMarco realized that he was about to lose the property in state court, he had Franklin file a bankruptcy petition in order to buy additional time to sell or lease the property. All of these factors evidence bad faith on the part of the debtor.

■ Second, this case has all the earmarkings of the "new debtor syndrome," which has long been identified as a pattern of conduct evidencing bad faith. The "new debtor syndrome" is characterized by "a one-asset entity that has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, ..." *Little Creek Development Co.*, 779 F.2d 1068 (5th Cir.1986). In the instant case, Franklin had been dormant for the three years prior to the October 21, 1991, transfer of the Worth Avenue property to Franklin less than 90 days prior to the filing of the chapter 11 petition. No consideration was paid for the transferred property. Franklin simply took the property subject to the existing mortgage. The debtor has one unsecured creditor, no employees, and no other significant assets. It clearly can be inferred from circumstantial evidence that Franklin was revitalized for

---

**1.** One of the requirements of confirmation of a chapter 11 plan is that there be at least one accepting impaired class of claims. 11 U.S.C. § 1129(a)(10). To allow the accounting firm's claim to serve that purpose would be a true case of the tail wagging the dog.

the sole purpose of taking title to the Worth Avenue property in order to isolate the property and thwart the state foreclosure proceeding instituted by the DeMarios. The DeMarios have thus established a *prima facie* case of "new debtor syndrome". Once a *prima facie* case has been established, the burden shifts to the debtor to demonstrate a good faith business reason for the creation or revitalization of the new entity, the transfer, and the chapter 11 filing. *In re Eighty South Lake, Inc.*, 63 B.R. 501 (Bankr.C.D.Cal. 1986), *aff'd* 81 B.R. 580 (9th Cir. BAP 1987). The debtor has failed to demonstrate any legitimate, good faith business reason for the revitalization of Franklin or the transfer to Franklin of the Worth Avenue property.

DeMarco's employment of a new entity to hold the property was a bad faith stalling tactic that requires that the chapter 11 petition be viewed as an abusive filing. Subsequent to DeMarco's default under the note and the institution of foreclosure proceedings by the DeMarios, the parties entered into a settlement agreement to allow DeMarco additional time to perform his obligations under the note. The DeMarios had no legal duty to grant such additional time but did so anyway. Under the terms of that agreement, DeMarco placed a deed to the Worth Avenue property in escrow that would be delivered to the DeMarios for recording in the event that the terms of the settlement agreement (payment of certain sums by a date certain) were not complied with by October 7, 1991. When it became evident that DeMarco would not be able to meet the October 7 deadline, the DeMarios agreed to two further extensions of the deadline for complying with the settlement agreement, first to October 14 and then to October 21, 1991.

DeMarco failed to comply with the terms of the modified settlement agreement. On October 21, 1991, the day the settlement agreement was set to expire and the escrow agent was to disburse the deed, DeMarco transferred the property by quitclaim deed from himself, as grantor, to the debtor, as grantee. The transfer of the property to Franklin was patently a maneu-ver to frustrate the settlement agreement and to prevent the DeMarios from foreclosing on the property. While there is no direct evidence of improper motive, it can be inferred from the circumstances that the transfer by quitclaim deed was done solely to thwart the right of the DeMarios to recover the property. The justification given by DeMarco for transferring the property to Franklin (that the transfer was made to take advantage of certain tax benefits and make the property more attractive to potential investors) was not credible.

Thus, the court concludes that DeMarco's pre-petition conduct was improper and that his actions were taken with the intent to evade his obligations under the settlement agreement in order to avoid foreclosure on the property. DeMarco's pre-petition bad faith conduct carries forward to taint his invocation of this court's processes by the filing of Franklin's petition. By allowing this case to go forward, this court would allow its processes to be abused by DeMario and Franklin as part of their tactic of delaying foreclosure as long as possible. The court will not allow its processes to be used as part of a scheme of abusive delay. Had DeMarco truly been interested in pursuing bankruptcy remedies in good faith, he would not have taken the abusive step of transferring the property to Franklin to frustrate the escrow arrangement. Instead, he could have proceeded to file an individual bankruptcy case, immediately. DeMarco procured delay unfairly and, once cornered again, filed the bankruptcy case as a final step in his efforts to delay foreclosure for as long as possible in the hope that a "white knight" would appear to rescue his investment.

To state it in other terms, the test of *Northwest Recreational, Duggan* and *Yukon Enterprises* requires dismissal. By transferring the property to his wholly owned corporation, DeMarco defeated the legitimate rights of the DeMarios under the escrow arrangement. The transfer enabled DeMarco to gain crucial delay, because he had no means then in sight of reorganizing the property, and to defer filing a reorganization for as long as possible.

The DeMarios' rights available prior to the transfer to Franklin were eroded by that transfer and subsequent chapter 11 filing.[2] Instead of dealing with a reorganization case filed prior to October 21, 1991, the date the escrow deed was to be delivered to them, they have been confronted with a reorganization case filed over two and a half months later, whereby DeMarco gained critical time to attempt to find some way to salvage his investment. That delay is unjustifiable and is an abuse of the processes of this court.

The debtor's Opposition to the Motion to Dismiss argues that a bankruptcy petition should not be dismissed for bad faith absent a showing of *both* objective futility and subjective bad faith. The debtor contends that there is substantial equity in the property and that the debtor has a present ability to reorganize its affairs under chapter 11. The debtor states in its Opposition that it has reached an "agreement in principle" to lease the property and generate sufficient cash flow to fund a plan of reorganization.

There is a split of authority over whether in deciding motions to dismiss for bad faith the courts should apply a subjective motive analysis, an objective feasibility analysis, or a hybrid analysis. *See* Katz, *Single-Asset Real Estate Cases and the Good Faith Requirement*, 9 Bankr.Dev.J. 77 (1992). Some decisions require that both objective futility and subjective bad faith be present. *See, e.g., Carolin Corporation*, 886 F.2d at 700, 701; *Little Creek*, 779 F.2d at 1072; *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir.1984). Other courts hold that dismissal may be justified when either futility or bad faith is

evident. *See, e.g., Phoenix Piccadilly, Ltd.*, 849 F.2d at 1395; *In re Plummer*, 115 B.R. 371 (Bankr.M.D.Fla.1990); *In re Oakgrove Village, Ltd.*, 90 B.R. 246, 249 (Bankr.W.D.Tex.1988); *In re Markunes*, 78 B.R. 875, 880 (Bankr.S.D.Ohio 1987).

Where a "new debtor syndrome" and resultant unfair delay of creditors is present, it makes no sense to require objective futility. The court must be able to protect its jurisdictional integrity. In contrast, other single asset cases not involving the "new debtor syndrome" usually present the question whether the case is futile and hence filed in bad faith. It makes sense to require objective futility before dismissing those cases. That is not what is at stake in a "new debtor" case. In the "new debtor" case the critical inquiry is whether the debtor has gained unfair advantage by employment of the new debtor device. Once bad faith has been established in a new debtor case, based on a finding of unfair delay, the existence of equity in the property and the prospects of a successful reorganization are irrelevant and cannot transform the bad faith filing into one taken in good faith. *Meyers Way Dev.*, 116 B.R. at 245; *In re Growers Properties No. 56 Ltd.*, 117 B.R. 1015, 1020 (Bankr.M.D.Fla.1990). To hold otherwise would allow the processes of the court to be used as part of an intentional scheme of delay: a court of equity can condition the use of its processes on conduct comporting with the public interest.[3]

For the reasons set forth above, I conclude that the debtor's petition was filed in bad faith. Inasmuch as bad faith has been established, the debtor's contentions as to equity or objective feasibility are irrele-

---

2. Had DeMarco himself filed bankruptcy, the DeMarios' claim, which was non-recourse against DeMarco, would nevertheless have been subject to being made a recourse claim under 11 U.S.C. § 1111(b)(1)(A) depending on what type of plan was eventually proposed. But I need not decide whether that constitutes another erosion of rights under the transfer. It suffices that the transfer resulted in delay to which DeMarco was not entitled. Had Franklin itself filed bankruptcy on October 21, 1991, this might or might not be an abusive filing.

3. As stated in *SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1940):

A bankruptcy court is a court of equity … and is guided by equitable doctrines and principles except in so far as they are inconsistent with the [statute]. … A court of equity may in its discretion in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest. It may in the public interest, even withhold relief altogether....

vant. The debtor's bad faith constitutes "cause" within the meaning of section 1112 of the Bankruptcy Code for dismissing this case. The motion to dismiss will be granted and an appropriate order will be entered.

### B. *Motion for Contempt and Sanctions*

The debtor seeks to hold the DeMarios liable under Section 362(h) of the Bankruptcy Code and also to hold the DeMarios in contempt. Section 362(h) provides that an *individual* injured by any willful violation of the automatic stay shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages. The provision does not apply to corporations. *In re Chateaugay Corp.*, 920 F.2d 183 (2d Cir.1990). *Contra, e.g., Budget Service Co. v. Better Homes of Va., Inc.*, 804 F.2d 289 (4th Cir.1986). Although I find *Chateaugay Corp.* persuasive, sanctions are nevertheless appropriate under the court's contempt power.

Craig Philip Rogers was advised of the Franklin bankruptcy filing on January 6, 1992. Under 11 U.S.C. § 362(a)(3) the filing of Franklin's petition operated as a stay of any act to enforce a lien against property of the estate. The filing of the chapter 11 petition thus operated to stay the pending state foreclosure action. Although aware of the automatic stay, Rogers sent a notice of sale to the clerk of the Palm Beach Circuit Court directing the clerk to publish a notice of judicial sale in the Palm Beach Review. That act, and the act alone, constituted a contempt: Rogers was aware of the automatic stay, the statute unambiguously prohibited acts to enforce the mortgage lien, and causing court publication of notice violated those prohibitions. Rogers' unreasonable belief that he was not violating the stay is irrelevant: willfulness is not an element of civil contempt. *McComb v. Jacksonville Paper*

*Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949). The DeMarios did not commit contempt of the automatic stay with respect to the acts of the Circuit Court after the filing of the debtor's petition that led to entry of the judgment of foreclosure: the court acted on its own. Section 362(a) is at least ambiguous as to whether it imposes upon a creditor a duty not to stand mute when the state court is about to commit a unilateral mistake and I need not decide whether such a duty exists. *United States v. Norton*, 717 F.2d 767, 774–75 (3d Cir.1983) (for contempt to be present statute must give fair warning of what is prohibited); *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1104 (2d Cir.1990). The court will give the debtor 10 days to file an affidavit of its counsel setting forth all attorney time expended as a result of the violation and sufficient detail as to billing rates and tasks performed to enable the court to assay the reasonableness of the charges and their causal connection to the specific violation of the automatic stay.[4]

### C. *Vacating of Circuit Court Judgment*

The entry of the Circuit Court judgment violated the automatic stay of 11 U.S.C. § 362(a). The debtor seeks an order voiding the order. In effect, Franklin seeks a declaration that the order is void. The DeMarios have not objected that an adversary proceeding was required under F.R.Bankr.P. 7001 and the court will proceed to decide the merits. As stated in *In re Albany Partners, Ltd.*, 749 F.2d at 675, "the important congressional policy behind the automatic stay demands that courts be especially hesitant to validate acts committed during the pendency of the stay." The bankruptcy court in *Albany Partners* annulled the automatic stay to validate a foreclosure sale. The court of appeals approved this ruling, stating "we cannot say that the bankruptcy court abused its discre-

---

**4.** DeMarco has alleged that Robert DeMario has made statements to a newspaper reporter ensuring that the foreclosure judgment would be published in a newspaper of general circulation, all of which was done to impair and impede the debtor's ability to reorganize. However, there is no proof of creditor interference by either the DeMarios or Craig Philip Rogers. Although Rogers admitted that he did speak to a reporter, there is no evidence that he caused the newspaper article to be published or that he told the reporter anything beyond the pleadings filed with the court.

tion by granting such relief in this case, particularly in light of the finding that the petition was not filed in good faith." *Id.* In *Albany Partners* there had additionally already been litigation between the creditor and a third party in which the state court had rejected the asserted interest of the debtor in the property. *Id.* In contrast, in *In re Eden Associates,* 13 B.R. 578, 585 (Bankr.S.D.N.Y.1981), no rejection of the debtor's asserted interest had occurred and the court declined to annul the automatic stay to validate a post-petition foreclosure sale. Instead, it simply restored the parties to the status quo as of the filing of the petition. Here the DeMarios took no affirmative step to procure entry of the judgment. The Circuit Court judge himself seized the initiative to enter judgment in the DeMarios favor. If the judgment is treated as void, a new judgment would undoubtedly be entered by the Circuit Court. Unlike *Eden Associates* there has been no sale here. However, Franklin may have been harmed if it failed to prosecute an appeal in reliance on the judgment being void by reason of the automatic stay, but Franklin has been silent in this regard. The decisive factor is that the DeMarios have not moved to annul the automatic stay and Franklin properly can view the limited issue before this court to be whether the judgment was a void act, not what arguments lie against granting annulment. In light of all of these considerations, the court will declare the judgment void.

## CONCLUSION

An appropriate order follows.