**In re FAY ASSOCIATES LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 98–956.**

United States Bankruptcy Court,
District of Columbia.

Aug. 15, 1998.

Stephen A. Bogorad, Richard E. Lear, Holland & Knight, LLP, Washington, DC, for Movant.

Judith A. Hoggan, Germantown, MD, Gary A. Rosen, Rockville, MD, for Debtor.

### REVISED DECISION REGARDING FANNIE MAE'S MOTION TO DISMISS

S. MARTIN TEEL, Jr., Bankruptcy Judge.

The Federal National Mortgage Association ("Fannie Mae") moved to dismiss this case or alternatively to convert this case to chapter 7. At the hearing on the motion on July 28, 1998, Fannie Mae elected to urge conversion as the best course. Fannie Mae's counsel ably presented its motion, raising numerous troubling issues regarding the debtor's goals and conduct in pursuing this case. Nevertheless, the court delivered an oral decision on July 29, 1998, determining that the motion should be denied. Elaborating further upon the grounds for denial, this decision revises and supplements that oral decision.

### I

Fannie Mae's motion was pursued on the basis that the debtor has pursued chapter 11 in bad faith and for cause in general. Essentially its motion comes down to these grounds:

(1) the filing was made principally so that limited partners of the debtor could avoid unfavorable tax consequences arising from a foreclosure of the debtor's real property; the filing serves no legitimate reorganization purpose because creditors having recourse could have been fully satisfied at the outset in a chapter 7 case and non-recourse creditors could be left to their collateral; the debtor has engaged in misconduct in the chapter 11 case by, for example, using cash collateral without authority and by filing an inaccurate statement of financial affairs and inaccurate schedules; and applying the multiple factor test this court set forth in *In re Franklin Mortgage & Inv. Co., Inc.*, 143 B.R. 295 (Bankr.D.D.C.1992), for determining whether a chapter 11 case has been filed in bad faith, this single asset case should be deemed filed in bad faith; and

(2) cause exists generally, if not for bad faith, to convert the case to chapter 7 because a chapter 11 will exhaust all cash funds (including funds held by counsel as retainers) whereas a chapter 7 could substantially pay off recourse creditors.

### II

The debtor is a limited partnership formed in January 1988. The debtor has two corporate general partners, Darala, Inc. ("Darala") and QCC Investment Corporation ("QCC"). Allan D. McKelvie is the president of Darala and Edward Symes is the president of QCC. McKelvie and Symes hold significant limited partner interests in the debtor.[1] The management of the debtor has essentially been carried out by McKelvie and Symes as presidents of the two general partners.

The debtor was formed in 1988 to own and it has continued to own real property, including improvements thereon, constituting an operating complex of apartment buildings known as Savannah Ridge Apartments at 2220–2249 Savannah Terrace, S.E. and 3225–3255 23rd Street, S.E., Washington, D.C. The complex and its related personal proper-

---

1. McKelvie initially owned a 49% interest in the debtor as a limited partner, but that interest has been reduced to a 45.9% interest in the partnership's profits and a 36% interest in its losses and in ownership of its capital. Symes and Kathleen M. Rotondora each own a 24.5% interest as limited partners. The two general partners each have a 1% interest in the debtor and the balance of the interests in the debtor are held by two other individuals.

ty, rents and revenues are the principal assets of the debtor. The property's day to day management is by Habitat America LLC which employs approximately 10 individuals for that purpose.

Fannie Mae holds a first deed of trust against the real property securing a $4.7 million note and an assignment of rents. The District of Columbia Department of Housing and Community Development ("DCHD") holds a second deed of trust on the real property. Both Fannie Mae's and DCHD's claims are non-recourse loans whereby they look solely to their collateral for repayment. The debtor has no equity in the real property.

Due to increased expenses of operation (including, for example, significant costs of providing security at the complex), and decreasing revenues (due in part to the increasing unattractiveness of the District of Columbia as a place to reside), the property has not generated sufficient funds recently to meet Fannie Mae's mortgage. Prior to the filing, several units had been unavailable for rent due to deferred maintenance. In January 1997, the debtor engaged Habitat America LLC to operate the property on a daily basis and the property is now largely rented.

Commencing on August 1, 1997, the debtor stopped making its monthly payments to Fannie Mae. It did so with the intention of filing bankruptcy to address its financial problems. Fannie Mae contends that instead of spending money on funding retainers to fight Fannie Mae in bankruptcy, the debtor could have used those funds to pay unsecured creditors and let the non-recourse creditors pursue their collateral.

The payments of retainers were as follows: In July of 1997, the debtor had employed Judith Hoggan as its counsel with an eye towards the possibility of eventually filing bankruptcy. The debtor paid Hoggan $120,000 in retainers before the commencement of the case on May 4, 1998. It paid her $40,000 on July 31, 1997; $40,000 on August 19, 1997; and $40,000 on October 9, 1997. On the petition date she was holding $92,023.15.

The debtor additionally paid retainers to Walter Birkel with an eye towards filing a so-called lender liability suit against Fannie Mae. On April 27, 1998, it paid Birkel $40,-000 and on May 1, 1998, it paid him $20,000, but he returned that $20,000 on May 18, 1998. He held $36,398.75 of the retainer on the petition date. This court recently ruled that Birkel was required to disgorge the $36,398.75 retainer as cash collateral of Fannie Mae.

Additionally, the debtor had $38,651.61 in checking accounts on the petition date. Thus, on the petition date, the debtor had $187,073.51 on hand either in cash or on deposit with Hoggan and Birkel as retainers. Disregarding Birkel's retainers which were disgorged as constituting cash collateral of Fannie Mae, the debtor had $150,674.76 on hand on the petition date. Disregarding the $38,651.61 in checking accounts on the petition date (which also likely constituted Fannie Mae's cash collateral), the debtor had only $112,023.15 on hand on the petition date that could have been used to pay recourse unsecured debt.

The debtor did not have an accurate compilation of unsecured debt when it filed its petition. The debtor's initial schedules reflected only $129,154.72 in liquidated unsecured claims consisting of priority claims of $51,891.92 (for water and sewer service of $34,891.92 and real estate taxes for January through April 1998 of $17,000) and general unsecured claims of $77,262.80. The schedules also included three unliquidated [2] personal injury claims that were already pending in the Superior Court of the District of Columbia. The record is unclear whether the debtor's insurance would fully cover such claims.

The debtor's amended schedules filed on July 27, 1998, schedule $183,128.80 in liquidated unsecured debt consisting of $79,632.99 in unsecured priority claims ($58,195.96 for water and sewer service; $4,437.03 for gas service; and $17,000.00 for real estate taxes) and $103,495.81 in general unsecured debt.

2. Although the schedules did not list these claims as unliquidated, it listed them as "disputed" with the amount "unknown." The court treats that as the same as being unliquidated for purposes of this decision.

The real estate tax claims are scheduled as coming due on July 1, 1998, after the filing of the petition such that a lien could be filed for such tax claims without violating the automatic stay. 11 U.S.C. § 362(b)(18). So the court will disregard that $17,000 in tax claims in computing unsecured claims.

That reduces the unsecured debt owed by the debtor on the petition date to $166,128.80 plus unliquidated personal injury claims. The debtor held $187,073.51 in checking accounts or on deposit with attorneys on the petition date. Thus, if Fannie Mae's security interest in the debtor's rents is disregarded, there was enough money on hand on the petition date to pay liquidated unsecured creditors in full.

No accurate picture was presented of the extent of unsecured debt during the six and a half months preceding the filing of the bankruptcy petition. Moreover, it may be surmised that unsecured trade debt was continually being incurred, as is the nature of trade debt for an operating apartment complex. Nevertheless, it may be surmised that at some point before Fannie Mae asserted its lien on the debtor's rents on April 23, 1998, the debtor likely could have paid off all recourse unsecured debt in full. But trade debt was being incurred on an ongoing basis, so it is likely that if the debtor made such a payoff it would upon continued operation incur additional debt. And once Fannie Mae asserted its lien, there would have been insufficient cash to pay trade debt in full.

The debtor's management's focus was not on making a snap shot of what recourse debt existed and addressing whether it could be paid off. Rather, it viewed the debtor as an ongoing enterprise in which they had invested many years of effort and an enterprise with credit problems that would not be resolved until the Fannie Mae debt was resolved. Although they could have considered the alternative of paying off recourse unsecured debt in full, their perspective was to attempt to negotiate a settlement with Fannie Mae or, failing that, to invoke the processes of the Bankruptcy Code to place the debtor on a reorganized sound financial footing.

By written notice dated April 23, 1998, Fannie Mae notified the debtor that it was in default under the note and the deed of trust, that Fannie Mae had accelerated the debtor's payments due under the note and had exercised its rights under the deed of trust to the rents and revenues of the property. On Friday, May 1, 1998, the debtor learned that on the morning of May 4, 1998, Fannie Mae intended to seek appointment, by the Superior Court of the District of Columbia, of a receiver for the property pending a foreclosure sale of the property. The debtor decided that it needed to file for bankruptcy before the appointment of a receiver. The debtor commenced this case on May 4, 1998, at 9:00 a.m.

The debtor's management, particularly Mr. McKelvie, face significant adverse tax consequences if the property goes to foreclosure. The court finds that this largely motivated the filing of the case. After the debtor stopped paying Fannie Mae on the mortgage, McKelvie consulted with his tax accountant regarding the tax consequences of a foreclosure and was informed in general terms what the tax consequences would be. Symes was generally aware as well that a foreclosure could impact his taxes. From a financial standpoint, the debtor pointed to no other motivation. The debtor did not even suggest that management was motivated by a desire to hold onto the property for potential appreciation in value.

Aside from the alleged unnecessariness of the filing and the tax avoidance motivation, Fannie Mae points to the debtor's many missteps in the handling of the case, including inaccuracies in the statement of financial affairs and the schedules and the use of cash collateral without authorization. These failings may have amounted to negligence and in the case of misuse of cash collateral perhaps recklessness, but they do not rise to the level of willful misconduct that would warrant a finding of bad faith. With respect to the misuse regarding cash collateral, Fannie Mae likely has available remedies that will make it whole.

## III

### THE ISSUE OF BAD FAITH

#### A. *Tax Avoidance as a Non–Bankruptcy Purpose Motivation*

The debtor's management's desire to avoid adverse tax consequences to themselves individually is not dispositive of whether the case was filed in bad faith. A debtor's management may decide to file bankruptcy based on a number of motivations: management may see the debtor's operation as a source of employment, thereby providing a salary to management; or management may take a sanguine view of the future and see the property as having potential for appreciation in value if they bring to bear their management expertise with the property's debt restructured to a manageable level. These are typical motivations for filing a chapter 11 case. They would not warrant a finding of bad faith.

■ Similarly a filing motivated by the desire to avoid adverse tax consequences to the partners that would arise from a foreclosure ought not invalidate a chapter 11 filing if the debtor is honestly pursuing chapter 11 with the intention to reorganize the property on a more sound financial footing. As observed in *In re Arnold*, 806 F.2d 937, 939 (9th Cir.1986):

> The existence of good faith depends on an amalgam of factors and not upon a specific fact. *Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir.1986). The bankruptcy court should examine the debtor's financial status, motives, and the local economic environment. *Id.* Said a Ninth Circuit bankruptcy panel:

> > If it is obvious that a debtor is attempting unreasonably to deter and harass creditors in their bona fide efforts to realize upon their securities, good faith does not exist. But if it is apparent that the purpose is not to delay or defeat creditors but rather to put an end to long delays, administration expenses ... to mortgage foreclosures, and to invoke

the operation of the [bankruptcy law] in the spirit indicated by Congress in the legislation, namely, to attempt to effect a speedy efficient reorganization, on a feasible basis ... good faith cannot be denied.

*In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. BAP 1983) (quoting *In re Loeb Apartments*, 89 F.2d 461, 463 (7th Cir.1937)).

Good faith is lacking only when the debtor's actions are a clear abuse of the bankruptcy process. *See id.*

This is a case of an operating asset, similar to a hotel. The debtor's management hopes to obtain a confirmed plan that will avoid foreclosure and allow them to continue to manage the property. Unless they do obtain a confirmed plan, the gig will be up: the property will go to foreclosure and the adverse tax consequences the debtor's management had hoped to avoid will not have been avoided.

The question is thus whether allowing the debtor to get to a confirmed plan would constitute an abuse of the bankruptcy system. By definition any confirmed plan will be feasible and fair and equitable. This means that the property would be put back on a sound financial footing where further reorganization will not likely be necessary.[3] There has been no showing that there is no prospect of the debtor proposing a confirmable plan. The court cannot conclude that the case was filed in bad faith simply because non-bankruptcy goals were the principal motivation.

#### B. *Whether Tax Avoidance Alone Constitutes Bad Faith*

■ The question remains whether it is permissible to use chapter 11 for tax avoidance. Is that motivation alone so pernicious as to constitute grounds for finding that the case was filed in bad faith? Under § 1129(d), tax avoidance is a ground for denial of confirmation if raised by a governmental unit. Fannie Mae, however, is not a govern-

---

**3.** The debtor's ownership will not change and this will prevent any possible disruption in the operation of the property. But the court doubts that a foreclosure sale would entail any disruption either.

mental unit.[4] Further, the court is not convinced that this plan would be found to be principally for tax avoidance purposes: it may have been motivated by limited partners' fear of what would befall them tax-wise in a foreclosure scenario, but the plan by reason of the criteria for confirmation would be aimed at reorganizing the debtor's operations on a sound financial footing. The debtor itself would not be avoiding taxes. The avoidance of foreclosure would incidentally relieve the limited partners of the tax credit recaptures and other tax consequences that would arise on foreclosure. But Congress has granted a taxpayer the right not to become subject to such tax recaptures if the taxpayer continues to retain ownership of the property. Without having researched the issue, my instinct tells me that avoiding foreclosure by way of a confirmed plan, with the consequence that no change of ownership arises to trigger tax credit recaptures to the limited partners, is not the type of tax avoidance Congress had in mind under § 1129(d).

## C. *Ability Fully To Pay Unsecured Creditors*

 Bad faith is not shown either by the added circumstance that the debtor allegedly held enough cash on the petition date (or on some earlier date) to pay off its unsecured debt and could have left the holders of non-recourse secured claims to their collateral. On the petition date the debtor probably could not pay off unsecured creditors because the bank account funds it held were largely if not exclusively cash collateral. But for purposes of analysis I will assume that it could make such a payoff on the petition date (or at least at some earlier date [5]).

Management viewed the debtor as an ongoing enterprise that would continue to have credit problems preventing it from paying all creditors, including secured debt, as their claims came due unless the debtor were financially reorganized. The unsecured claims left unpaid when the case was filed were of the very sort that enabled the debtor to operate and to attempt to make improvements to put itself closer to a stabilized operation. With Fannie Mae's invocation of its rights to the debtor's rents and its threat of obtaining a receiver, the debtor could no longer continue in its efforts to address the debtor's financial problems short of filing a bankruptcy case.

Essentially Fannie Mae is urging that a debtor's management should be required to throw in the towel—forego the possibility of attempting a reorganization—when it has sufficient funds to pay all recourse unsecured debt and has no equity it its property. Although that might make economic sense and be a plausible approach to take legislatively, this court does not sit as a legislative body. Congress has given a debtor the right to invoke chapter 11 to attempt to use its tools for reorganization, to act as a debtor in possession in control of the estate (11 U.S.C. §§ 1101(1) and 1107) with a first shot at proposing and attempting to obtain confirmation of a plan (11 U.S.C. § 1121(c)). The plan can call for continued retention of ownership of the debtor's property by the debtor. 11 U.S.C. § 1123(a)(5)(A). While a plan may also provide for transfer of a property to the holder of a secured claim in satisfaction of that claim (11 U.S.C. § 1129(b)(2)(A)), that is not a required approach.

The court finds this case distinguishable from *In re North Vermont Assocs., L.P.*, 165 B.R. 340 (Bankr.D.D.C.1994). There the property was not being put on sound financial footing but rather being conveyed in an "eat dirt" fashion to the secured creditor with the property valued at fair market value as a credit on the debt. The "eat dirt" provision served no purpose but to minimize

---

**4.** The District of Columbia, on the other hand, is a governmental unit and is currently supporting the debtor's attempts to reorganize, but not as a tax creditor: it holds a junior non-recourse lien on the debtor's property and could only hope to recover anything in a chapter 11 case.

**5.** If Fannie Mae accepted a deed in lieu of foreclosure upon recourse debt being paid in full, the debtor could then wash its hands of the property

and of the debts it had generated. The debtor likely could not have arranged a deed in lieu of foreclosure with Fannie Mae because Fannie Mae would want to pursue foreclosure to wipe out DCHD's junior lien. But for purposes of argument the court will assume that the debtor could have paid off all trade debt incurred before being divested of title.

guarantors' exposure to the larger deficiency claims that might result were the property to go instead to foreclosure. The debtor was not attempting to put its business back on a sound financial footing.

*North Vermont* invoked the doctrine of artificial impairment in finding bad faith. The debtor in *North Vermont* had sufficient funds on hand to pay all unsecured claims in full. The debtor's plan proposed making less than full payment to them. The court held that such artificial impairment could not in good faith be used to achieve the debtor's ulterior purposes. But that boiled down to a holding that the debtor, without a valid bankruptcy goal in mind, could not point to a potential accepting class of creditors as a basis for arguing that there might be a confirmed plan of benefit to that accepting class. The "eat dirt" provision was a blatant attempt to use bankruptcy to advance non-bankruptcy goals, with no need to invoke bankruptcy to protect the holders of undisputed unsecured claims.

■ Here, in contrast, the debtor is attempting to continue to own its property and to place it on a sound financial footing. As long as that goal is honestly pursued, and any plan proposed meets the protections of claimants' rights accorded them by the Bankruptcy Code, bad faith cannot be said to be present. While treatment of unsecured claims under any plan may present issues of good faith (if the plan proposes payment of less than what the debtor could have paid unsecured creditors on the filing of the petition by electing to pursue chapter 7 in the first instance), it is premature to assay those issues now. Although the debtor could substantially pay recourse unsecured debts with funds which have been paid to counsel and could do a deed in lieu of trust to Fannie Mae or consent to foreclosure, this debtor

has rather proposed to put itself on sound financial footing pursuant to the reorganization tools of chapter 11. That is not bad faith. While Fannie Mae has standing to raise the issue of the treatment of general unsecured creditors as it bears on the bad faith issue, there has been no showing that the debtor's plan will not fairly address unsecured claims in a good faith fashion.[6]

### D. *Misconduct*

Although the debtor has engaged in sloppy handling of this case, I do not think that it has engaged in the level of gross mismanagement that would be grounds for appointment of a chapter 11 trustee or, alternatively, conversion to chapter 7, a more drastic remedy. Clear and convincing evidence would be required for a chapter 11 trustee to be appointed. The debtor's conduct has been negligent and in the case of misuse of cash collateral even reckless, but it has not been willful. And other remedies for misuse of cash collateral, including imposing personal liability on McKelvie for such misuse, likely exist. The debtor's misconduct, even combined with the other conditions in the case, does not warrant a finding of bad faith.

### E. *Factorial Analysis*

■ In *In re Franklin Mortgage & Inv. Co., Inc.*, 143 B.R. 295, 299–300 (Bankr. D.D.C.1992), citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir.1986); and *Duggan v. Highland–First Ave. Corp.*, 25 B.R. 955, 961 (Bankr.C.D.Cal.1982), this court enumerated eight factors courts have looked to in determining whether bad faith exists in a single asset bankruptcy case. (A similar list of factors was set forth in *In re Phoenix–Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988).) Two of the factors quoted were particularly germane in *Franklin Mort-*

**6.** Unsecured creditors have not appeared in support of the motion to convert. They may see their interests better served by reorganization: they will have significant leverage in chapter 11 negotiations. They may have motivations besides just payment of their claims, such as long-standing relationships with the debtor. More likely, they have failed to participate out of apathy. But even if recourse unsecured creditors had joined in the motion to dismiss, the analysis would be the same.

A non-recourse creditor, the District of Columbia through one of its agencies, has voiced support of the case's staying in chapter 11, for the obvious reason that its only hope of receiving anything is in a chapter 11 case. But its presence in the case would not be enough to negate a showing of bad faith as to recourse creditors has such a showing been made.

*gage:* allegations of wrongdoing of the debtor's principal and the "new debtor syndrome" in which an insolvent property is transferred to an entity created or revitalized on the eve of foreclosure to isolate the property and its creditors. These alone were enough in *Franklin Mortgage* to justify the finding of bad faith: instead of filing bankruptcy himself, the property's owner had delayed the day of reckoning by spinning off the property to his corporation, the debtor, to frustrate the effectiveness of a deed in escrow that would have terminated his ownership of the property. The court observed that even if there were equity in the property or a present ability to reorganize, the finding of unfair delay still warranted a dismissal for bad faith.

Typically the "bad faith" factors approach is employed where the debtor's case is a futility from the outset, but Fannie Mae has not made a showing that this case is insusceptible of a confirmed reorganization plan. That the debtor's cash flow is inadequate to pay Fannie Mae's monthly debt service is meaningless because the plan will fix whatever sum is required to be paid to Fannie Mae and will set forth the means for accomplishing that. Fannie Mae made no effort to adduce what type of plan the debtor could propose.

Instead, Fannie Mae urges the court to apply the factors mechanically to find bad faith. But the court has already applied the factors in the foregoing analysis and found them to be insufficient standing alone or in combination to warrant a finding of bad faith. As observed in *In re Park Forest Dev. Corp.,* 197 B.R. 388, 393–94 (Bankr.N.D.Ga.1996) (citations omitted):

> *Phoenix Piccadilly* has not been applied mechanically, because "[b]ad faith in the filing of a bankruptcy petition is a finding of fact not subject to any per se approach." The *Phoenix Piccadilly* case was a fact intensive decision where "the entire record reeked of malice, spite and ill-will by the debtor." The debtor in *Phoenix Piccadilly* used scorched earth tactics against its secured creditors when it threatened to file, and did file, a petition in a distant forum designed to forestall the secured

creditors "for years." Without this sort of "smoking gun," indicating an "overt intent to inconvenience or frustrate creditors' rights beyond the congressionally permitted limits," courts have been reluctant to find bad faith warranting dismissal.

The *Phoenix Piccadilly* factors are a guide for the exercise of the bankruptcy court's discretion and in and of themselves do not require dismissal. A real debtor should not be precluded from availing itself of the rehabilitative provisions of Chapter 11, unless other indications of bad faith are present. "[T]he real test that still remains is the presence of honest intention of the Debtor and some real need and real ability to effectuate the aim of the reorganization even if this involves the total liquidation of assets."

The court declines to apply the factorial analysis in the rigid mechanical fashion urged by Fannie Mae.

## IV

### SUBSTANTIAL PAYMENT OF RECOURSE UNSECURED DEBT AS GROUNDS

■ It appears that Fannie Mae also urges the court to convert the case to chapter 7 for general cause because unsecured creditors could recover a substantial sum in chapter 7 (from the unused portion of the retainer that Hoggan holds). Even though Fannie Mae is not a recourse unsecured creditor, Fannie Mae has standing to make this argument because 11 U.S.C. § 1112(b) permits any "party in interest" to seek to dismiss or convert the case to chapter 7, "whichever is in the best interest of creditors and the estate, for cause." Fannie Mae is a party in interest and has a substantial stake in converting this case to chapter 7 in order to avoid the delay and expense that a chapter 11 case will entail.

■ Assuming that recourse unsecured creditors could be paid in full in chapter 7, that would mean that from the creditors' perspective a chapter 11 case is unnecessary: recourse unsecured creditors will be paid in full and nonrecourse lien creditors will be able to enforce their liens against their collat-

eral. There is no equity in the property, so under 11 U.S.C. § 362(a) Fannie Mae and DCHD could obtain in the chapter 7 case relief from the automatic stay of 11 U.S.C. § 362(a) to foreclose on their collateral. Chapter 7 will not entail a piecemeal liquidation of the debtor's apartment complex. The apartment complex would be sold at foreclosure and a new owner will continue to operate the apartment complex with practically no disruption. From my own economic and policy perspective, it would make sense to convert the case to chapter 7: chapter 11 should be principally concerned with reorganizing the debtor's affairs for the benefit of creditors, not minimizing adverse tax consequences to the debtor's limited partners.

But as already observed with respect to the bad faith issue, Congress has not written the statute that way. In 11 U.S.C. § 1123(a)(5) it clearly has viewed continued retention of ownership as a permissible goal of chapter 11 as long as the requirements for confirmation of a plan have been met. And Congress gave the debtor an exclusive period for obtaining a confirmed plan before other parties could propose a plan. 11 U.S.C. § 1121.

One of the goals of any business reorganization statute is to permit the debtor to continue to operate as a going concern thereby insuring greater value than were its assets sold piecemeal or for scrap, an unnecessary goal if nonrecourse creditors would be paid in full in chapter 7. But Congress has not written the statute to make that goal a requisite for employing chapter 11. For example, the statute clearly contemplates that chapter 11 may be employed to liquidate the debtor's assets. 11 U.S.C. §§ 1123(a)(5)(D) and 1141(d)(3).

Accordingly, even if nonrecourse creditors would be paid in full in chapter 7, that is not grounds for converting this case to chapter 7. Moreover, it appears that unsecured creditors would not be paid in full in chapter 7 because Fannie Mae's liens likely encumber the cash the debtor has on hand.

Nevertheless, the debtor's principal motivation in using chapter 11—to avoid the adverse tax consequences that a foreclosure would visit on the debtor's limited partners—is troublesome. The debtor will be given its due under the statute, but the court will not brink delay, particularly if the delay is designed to forestall foreclosure to a later year when the tax consequences to the limited partners may be less severe.